**MESA PETROLEUM COMPANY, a corporation, Occidental Petroleum Corporation, a corporation, the Bendix Corporation, a corporation, Plaintiffs-Appellees,**

v.

**CITIES SERVICE COMPANY, a corporation, Martin Marietta Corporation, a corporation, Defendants,**

**Deanna Burger, Acting Administrator of the Oklahoma Department of Securities, Defendant-Appellant.**

Nos. 82–1838, 82–2614, 82–2615 and 83–1082.

United States Court of Appeals, Tenth Circuit.

Aug. 18, 1983.

on brief), for plaintiff-appellee Mesa Petroleum Co.

John Thompson, Oklahoma City, Okl. (Deanna Burger, Oklahoma City, Okl., on brief), for defendant-appellant Acting Administrator of Okl. Dept. of Securities.

Burck Bailey and Margaret McMorrow-Love, of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., submitted a brief for plaintiff-appellee, The Bendix Corp.

Before SETH, SEYMOUR and TIMBERS *, Circuit Judges.

TIMBERS, Circuit Judge.

The chief issue presented by these consolidated appeals is the constitutionality of the Oklahoma Take-Over Bid Act, 71 O.S. §§ 431–450 (1981) (Oklahoma Act or the Act).

The District Court for the Western District of Oklahoma, David L. Russell, *District Judge,* struck down the Act on the ground that it violated the commerce clause of the United States Constitution. We agree. We affirm.

Our task in deciding these appeals has been rendered easier by the recent decision of the Supreme Court in *Edgar v. MITE Corp.,* 457 U.S. 624 (1982), which struck down as unconstitutional a similar Illinois statute, the Illinois Business Take-Over Act, Ill.Rev.Stat., ch. 121½, ¶ 137.51 *et seq.* (1979) (Illinois Act).

Vaughn Williams, of Skadden, Arps, Slate, Meagher & Flom, New York City (Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., on brief), for plaintiff-appellee Occidental Petroleum Co.

Burck Bailey, of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl. (Margaret McMorrow-Love, of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl.; John Held and William R. Burke, Jr., of Baker & Botts, Houston, Tex.,

The Acting Administrator of the Oklahoma Department of Securities (Administrator) appeals from an order entered in the Western District of Oklahoma preliminarily enjoining enforcement of the Oklahoma Act, and from that court's permanent injunctions against enforcement of the Act, entered on motions for summary judgment in favor of appellees Mesa Petroleum Company (Mesa), Occidental Petroleum Corporation (Occidental) and Bendix Corporation

(Bendix).[1] Each of the appellees had made tender offers that were subject to the sanctions of the Act. The purpose of their actions in the Western District of Oklahoma was to prevent the Administrator from enforcing that Act against them.

## I.

These appeals by the Administrator—four separate appeals[2]—have been consolidated for consideration by this Court since all involve the same dispositive issue: whether the Oklahoma Act violates the commerce clause of the United States Constitution as an unreasonable restraint on interstate tender offers for corporate securities.

The Oklahoma Act applies by its terms to any tender offer in which the "target company" (1) is organized under the laws of Oklahoma, or (2) has substantial assets and its principal place of business in Oklahoma, or (3) has substantial assets and significant operations in Oklahoma, or (4) has shareholders in Oklahoma who own, beneficially or of record, an aggregate of ten percent of any class of equity securities which are subject to the take-over bid. 71 O.S. § 433(4)(a)–(d) (1981). Under the Act the Administrator is given the power, most significantly, to pass upon the adequacy of the disclosure made in connection with any tender offer for shares in qualifying target companies and thereby to prohibit or at least delay the consummation of such tender offer. *Id.* at § 437. To prevent any delay in the consummation of their tender offers for statutory target companies, appellees Mesa, Occidental and Bendix, concurrently with the commencement of their tender offers, each moved to enjoin enforce-

ment of the Oklahoma Act against them. The chronology of the various interrelated actions which we have before us is sufficiently complex to warrant a separate summary of each.

### MESA

On June 7, 1982, Mesa commenced its cash tender offer for the shares of Cities Service Company, a corporation with substantial assets and its principal executive offices in Oklahoma. Mesa made the requisite filings under federal law.[3] Instead of filing an "information statement" with the State of Oklahoma, as required by the Oklahoma Act, 71 O.S. § 425 (1981), Mesa filed its action in the Western District of Oklahoma one day prior to the public announcement of its offer. Simultaneously Mesa filed its motion for a preliminary injunction and for a temporary restraining order. In its complaint Mesa alleged that the Oklahoma Act violated the commerce and supremacy clauses of the United States Constitution and that the Act was preempted by the federal securities laws.

The district court entered a temporary restraining order, which then was amended *nunc pro tunc* on June 8, 1982. On June 18, the court held a hearing on Mesa's motion for a preliminary injunction. After that hearing, but prior to the court's decision on the motion, the Supreme Court decided *MITE,* in which it struck down the Illinois Act as violative of the commerce clause.

On June 22, Gulf Oil Company entered the lists for control of Cities Service, making its own cash tender offer. Mesa subsequently withdrew its tender offer. The withdrawal notwithstanding, on July 2 the district court entered the preliminary injunction sought by Mesa on the ground that

1. The Administrator's appeal from a summary judgment entered in favor of Joseph E. Seagram & Sons, Inc., another tender offeror who successfully sought to enjoin the Administrator from enforcing the Act, has been dismissed upon stipulation of the parties.

2. The Administrator appeals from the preliminary injunction in favor of Mesa, and as well as from separate summary judgments in favor of

Mesa, Occidental and Bendix granting permanent injunctions, as stated above. Each of the underlying actions is summarized *infra.*

3. Mesa filed a Schedule 14D–1 with the SEC as required by § 14(d)(1) of the Williams Act, 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f) (1976).

Mesa still was subject to prosecution under the Act for its failure to comply with it. 71 O.S. § 448 (1981).[4] The Administrator on the same day filed a notice of appeal to this Court.

Mesa thereafter moved for summary judgment. On December 21, the court granted the motion and entered its judgment declaring the Act unconstitutional and permanently enjoining the Administrator from enforcing it. From that judgment, the Administrator filed a notice of appeal on December 23.

By order of this Court dated February 15, 1983, the Administrator's appeal from the order granting the preliminary injunction was consolidated with the Administrator's appeal from the summary judgment in favor of Mesa.

OCCIDENTAL

On August 18, 1982, Occidental announced its intention to acquire control of Cities Service by means of a cash tender offer. Like Mesa, Occidental dealt with the filing requirements of the Oklahoma Act by commencing an action in the Western District of Oklahoma to have the Act struck down as unconstitutional. Occidental's grounds for seeking injunctive and declaratory relief in all material respects were the same as those urged by Mesa.

The district court granted Occidental's motion for a temporary restraining order on August 19, the same day Occidental officially commenced its tender offer. The TRO was entered following a hearing at which the Administrator refused to state that he would not enforce the Act against the offeror.[5] On September 10, Occidental successfully consummated its tender offer, purchasing some 34.4 million Cities Service shares.

After some sparring among the parties with discovery, Occidental moved for summary judgment. On December 20, the court granted the motion and permanently enjoined enforcement of the Act. From that judgment, the Administrator filed a notice of appeal on December 23.

On January 10, 1983, the Administrator filed a petition for a writ of prohibition in this Court, seeking to prohibit other federal judges in the Western District of Oklahoma from relying on either the *Occidental* case or the *Mesa* case in subsequent rulings or judgments. This Court denied the writ on February 8, 1983.

BENDIX

While Mesa, Gulf and Occidental were contending for the hand of Cities Service, Bendix was laying plans for its own ill-starred siege of the Martin-Marietta Corporation. On August 25, Bendix followed the path of Occidental and Mesa to the Western District of Oklahoma courthouse door, where it commenced an action against the Administrator seeking declaratory and injunctive relief. On August 26, the court entered the temporary restraining order requested by Bendix. In the wake of discovery requests by the Administrator, Bendix moved for a protective order. The court stayed discovery on September 16. On December 21, in accordance with its decisions in *Occidental* and *Mesa,* the court entered judgment granting to Bendix the same relief granted in *Occidental* and *Mesa.* From that judgment, the Administrator filed a notice of appeal on January 3, 1983.

II.

The most important question raised by these appeals is whether it follows a fortiori from *MITE* that the Oklahoma Act violates

4. Section 12 of the Act provides a private right of action against offerors who violate "any provision of this act". There is a two year statute of limitations. 71 O.S. § 442 (1981).

5. As the district court stated:

"[i]n hearings before this court in this case and two similar cases, [Mesa and Bendix], Defendant Marley [at that time the Administrator] has repeatedly refused to assure plaintiff or the Court that he will not enforce the Act as being a criminal action under 71 O.S.1959 § 101 et seq."

the commerce clause. We address that question first. We shall then proceed to the various specific challenges to the propriety of the preliminary injunction and the summary judgments.

In *MITE,* the Supreme Court held that the Illinois Act violated the commerce clause because its indirect burden on interstate commerce was excessive in relation to the local interests it served under the test of *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970). The Court was convinced that the Illinois Act placed a substantial indirect burden on the buying and selling of corporate securities—since it allowed the state, under the guise of assessing the adequacy of disclosure, to delay and thus to frustrate nationwide tender offers—and that this burden was excessive in relation to the legitimate state interests, primarily the protection of domestic shareholders, served by the statute. Perhaps of chief significance, the Illinois Act allowed state enforcement officials to halt a nationwide tender offer—where each extra tick of the clock may sound a death knell for the offer—even though none of the corporation's shareholders resided in Illinois.

▇ Despite the Administrator's valiant efforts to highlight differences between the Illinois Act and the Oklahoma Act, we believe that the same burdens and interests are implicated in both. The Oklahoma Act closely resembles the unconstitutional Illinois Act. Any differences amount to inconsequential variants of degree.

The central problem with the Illinois Act, in the Supreme Court's view, was its provision which allowed the state, under the banner of protection for its citizens, effectively to block a nationwide tender offer. The same fatal flaw afflicts the Oklahoma Act. Pursuant to § 7 of that Act, 71 O.S. § 437 (1981), the Administrator may forbid

purchase or payment "for any equity security" if he determines that the disclosure made in connection with the tender offer is not "full, fair and effective". The disclosure required by the state pursuant to the Oklahoma Act may not necessarily be co-extensive with the disclosure demanded by federal law pursuant to the Williams Act. Indeed no standard is provided in the Oklahoma Act for assessing adequacy. Furthermore, the Oklahoma Act suffers from another infirmity adverted to by the Court in *MITE:* the Act's disclosure requirements apply to any tender offer for a statutory "target company", but a company may be a "target company" even though none of its shareholders is an Oklahoma resident. 71 O.S. § 433(4)(a)–(d) (1981). Accordingly, since a company with "substantial" assets and operations in Oklahoma qualifies as a "target company", the state, under the Act, may halt for further investigation or even enjoin a tender offer made exclusively to persons outside Oklahoma.

Such extraterritorial reach undoubtedly places a substantial burden on the interstate trade in securities. Tender offers are a nationwide phenomenon, invariably made through the instrumentalities of interstate commerce. The Court in *MITE* was concerned not so much with the particular operation of the Illinois Act within the state as with its intolerably burdensome interstate effect. The Oklahoma Act has precisely the same effect: it allows Oklahoma, as the Illinois Act allowed that state, to impede and thwart nationwide tender offers under the aegis of shareholder protection.

Similarly, the Illinois and Oklahoma Acts were designed to serve the very same state interests—primarily local investors.[6] But in *MITE* the Court doubted the efficacy of the protection the Illinois Act provided even to local shareholders:

---

**6.** Of course such interests would not be served under the Oklahoma Act where the "target company" has no Oklahoma shareholders, or to the extent that the offer is made to shareholders residing elsewhere, although the Act's disclosure requirements may still apply. As the Court stated in *MITE,* "[i]nsofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law." 457 U.S. at 644.

"The Illinois Act seeks to protect shareholders of a company subject to a tender offer by requiring disclosures regarding the offer, assuring that shareholders have adequate time to decide whether to tender their shares, and according shareholders withdrawal, proration and equal consideration rights. However the Williams Act provides these same substantive protections...."

457 U.S. at 644.

The Oklahoma Act likewise substantially duplicates the Williams Act. To the extent that the Oklahoma Act, like the Illinois Act, goes beyond federal law, the Court has viewed these added "protections" as of dubious value:

"As the Court of Appeals noted, the disclosures required by the Illinois Act which go beyond those mandated by the Williams Act ... may not substantially enhance the shareholders' ability to make informed decisions.... It was also of the view that the possible benefits of the potential delays required by the Act may be outweighed by the increased risk that the tender offer will fail due to defensive tactics employed by incumbent management. We are unprepared to disagree with the Court of Appeals in these respects, and conclude that the protections the Illinois Act affords resident security holders are, for the most part, speculative."

457 U.S. at 645.

The Court in *MITE* also brushed aside any state interest in regulating the internal affairs of domestic corporations, since the Illinois Act by its terms applied to foreign as well as domestic corporations. *Id.* at 645–46. The same is true of the Oklahoma Act.

As the opinion in *MITE* makes clear, the Supreme Court was not concerned with the minutiae of the Illinois Act. Its central features, which the Oklahoma Act tracks in every particular, were the source of the constitutional infirmity. The Administrator's attempt to find minor variances between the provisions of the two acts is an essentially futile exercise. These variances, which involve such things as the filing time and the time within which a hearing must be held, fall within Judge Learned Hand's category of "distinctions without a difference".[7] The essential point is bellweather clear: under the Oklahoma Act the Administrator may halt, indefinitely, a nationwide tender offer if he finds the disclosure to be "inadequate" by some unspecified standard. The countervailing state interest, on the other hand, is only weakly served in light of overlapping protection provided by the federal securities laws.[8]

---

7. Among the principal variances in the Oklahoma Act identified by the Administrator at oral argument were the following three, none of which strikes us as a substantial departure from the Illinois Act:

    1. No pre-offer filing is required before the tender offer can go forward, at least for those offers subject to the filing requirements of the Williams Act. In such cases Oklahoma will accept the Schedule 14D–1 statement.

    2. Any hearing ordered by the Administrator must be concluded within 20 days of the initial filing.

    3. The Administrator alone can determine whether or not to hold a hearing; the target company cannot demand such a hearing.

These distinctions do not alter the fact that the Administrator can halt the tender offer for far longer than 20 days, if he finds the disclosure somehow inadequate—although 20 days could mean the difference between success and failure in a take-over battle. Furthermore the Act provides, in Section 7 C, that "[a]ny person aggrieved" may obtain judicial review of the Administrator's decision. Even if the Administrator allows the tender offer to proceed, therefore, a private litigant may be able to delay the process in the Oklahoma courts.

8. The Administrator invites us to focus upon Justice Powell's concurrence in *MITE*, where he stated that he joined Justice White's majority opinion "because its Commerce Clause reasoning leaves some room for state regulation of tender offers." 457 U.S. at 646 (Powell, J., concurring). It is less than clear as to what room is left for state regulation and Justice Powell does not elaborate on his view of permissible state regulation of tender offers. But since he found the Illinois Act to be overly intrusive, presumably the minor differences between that Act and the Oklahoma Act would not lead him to a

In holding that the Oklahoma Act unreasonably impinges upon the commerce clause, we join a number of other federal courts of appeals that have invalidated analogous state statutes because of the same fatal flaws. *E.g., Telvest v. Bradshaw,* 697 F.2d 576, 579–82 (4th Cir.1983) (Virginia); *Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 565 (6th Cir.1982) (Michigan); *National City Lines v. LLC Corp.,* 687 F.2d 1122, 1133 (8th Cir.1982) (Missouri); *Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1286 (5th Cir.1978) (Idaho), *rev'd on venue grounds sub nom. Leroy v. Great Western United Corp.,* 443 U.S. 173 (1979).[9]

### III.

We turn next to the Administrator's various challenges with respect to the preliminary and permanent injunctions prohibiting enforcement of the Oklahoma Act against Mesa, Occidental and Bendix and to the propriety of the summary judgments granting the permanent injunctions.

### (A)

The Administrator claims that the withdrawal of the tender offers mooted the cases, and that therefore no injunctions validly could have been entered.

This argument was convincing enough to persuade Justices Brennan, Marshall, Powell and Rehnquist in *MITE* where the same question was presented. In that case, as here, the tender offer had been withdrawn and the state had taken no steps to enforce the Illinois Act against the offeror. But the majority of the Court held squarely that the case was not moot.[10] The possibility of legal action by the state against the offeror for violation of the statute, even after withdrawal of the offer, was sufficient to foreclose dismissal of the action for mootness.

There is no significant difference in this regard between the cases before us and *MITE*. In each of the instant cases the offeror sought injunctive relief, although the offer had been withdrawn, because of its possible liability for failure to comply with the statute. The one possible distinction is that it was the avowed intention of Edgar, the Illinois Secretary of State, to enforce the Illinois Act against MITE. The Administrator claims that the absence of such intent here is enough to rob his action of its last breath. But the putative enforcement intent of a particular state official is too slender a reed on which to rest our decision as to whether a live controversy is presented. In the course of this litigation at least two individuals have stood in the shoes of the Administrator.[11] This indicates the uncertainty that the Administrator's proposed distinction, if accepted, would create. The fact is that each of these Administrators could give no assurance that the Act would not be enforced against the appellees. As the first Administrator candidly admitted to the district court, "[I]t should be understood that Mr. Marley, as Administrator of the Department of Securities, is charged with the enforcement of the Oklahoma Act; state law is determinative of his enforcement intentions." In view of

---

different result here, since the essential features of both Acts are the same.

**9.** Furthermore, the First Circuit has held that "*Edgar* indicates that the constitutionality of the Massachusetts statute presents very serious and substantial questions, leaving its validity very much in doubt...." *Agency Rent-A-Car v. Connolly,* 686 F.2d 1029, 1040 (1st Cir. 1982). Since the district court had not yet ruled on the validity of the statute under the commerce clause, however, the First Circuit deferred further consideration of that issue.

**10.** "The Court of Appeals specifically found that this case was not moot ... reasoning that because the Secretary had indicated he intends to enforce the Act against MITE, a reversal of the judgment of the District Court would expose MITE to civil and criminal liability for making the February 5, 1979 offer in violation of the Illinois Act. We agree." 457 U.S. at 630 (footnote omitted).

**11.** Marley and Burger.

the conceded violations by each appellee of the Oklahoma Act, and the Administrators' inability to absolve them from liability for such violations, there can be no doubt that the instant actions are every bit as live as the action before the Court was in *MITE*.

We hold that the Administrator's claims of mootness are without merit.

### (B)

■ For substantially the same reasons, we reject the Administrator's claim that Mesa's action did not present a case or controversy as required by Article III of the United States Constitution. Although the Court did not expressly address that issue in *MITE*,[12] the same controversy that gave life to *MITE* is present in *Mesa*. The tender offer made by Mesa violated the Oklahoma Act. Mesa remained potentially liable for that violation even after its offer had been withdrawn. This possibility of prosecution for non-compliance with an allegedly unconstitutional statute implicitly was found to satisfy the justiciability requirements of Article III in *MITE*.

Analogous Supreme Court precedents indicate that the instant cases remained justiciable even after the tender offers had been withdrawn. In *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506–07 (1972), the Court held that the present duty to comply with an allegedly unconstitutional state water pollution statute presented an "actual controversy". The present obligation to comply "in and of itself makes [appellants'] attack on the validity of the law a live controversy, and not an attempt to obtain an advisory opinion." *Id.* at 507. In *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298–99 (1979), the Court found a live controversy by virtue of appellees' claim that they were subject to potential criminal prosecutions under an allegedly unconstitutional statute. The Court held

that, where this fear was not imaginary or wholly speculative and where the state had not disavowed its intention of initiating such prosecutions, there was a constitutionally sufficient case or controversy. *Id.* at 302.

We hold that Mesa's action presented a case or controversy as required by Article III.

### (C)

The Administrator also argues that Mesa failed to make the requisite showing of irreparable injury and that therefore the preliminary injunction was improperly granted.[13]

■ There can be no doubt that plaintiffs below were threatened with irreparable injury with respect to their tender offers by the provisions of the Oklahoma Act while the offers were in effect. If the offerors had been forced to comply with the Act, fatal delays might have resulted from the Administrator's actions.

Even after the offers were withdrawn, there remained a possibility of irreparable injury to the offerors. The offerors had made their offers in violation of the Oklahoma Act. They were subject to prosecution under that allegedly unconstitutional Act. It was this threat of punishment that, implicitly, made out the irreparable injury requirement in *MITE*. For in that case the tender offer also had been withdrawn, and yet the Supreme Court affirmed the grant of injunctive relief because of the continuing threat of prosecution faced by the offeror for its failure to comply with the Illinois Act. If the requirements for injunctive relief were met in *MITE*, clearly they also were satisfied on the virtually indistinguishable facts of the instant cases.[14]

Since the Supreme Court implicitly has recognized that potential prosecution for

---

12. The Court did discuss extensively the analogous issue of mootness.

13. A showing of possible irreparable injury is required for both preliminary and permanent injunctions. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49 (1975). The Administrator's argument in this respect therefore extends to the

permanent injunctions entered by the district court as well as to the preliminary injunction entered in favor of Mesa.

14. The Administrator claims that the Declaratory Judgment Act constituted an adequate remedy at law and therefore no preliminary

failure to comply with a state take-over statute is the sort of threatened harm that warrants injunctive relief, and since Mesa certainly had a substantial likelihood of success on the merits, we cannot say that the district court abused its discretion in granting the preliminary injunction in favor of Mesa. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980); *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 781 (10th Cir.1964) (per curiam).

■ We hold that the judgments permanently enjoining the Administrator from enforcement of the Oklahoma Act likewise were proper under *MITE.*

(D)

The Administrator also contends that the district court erred in granting summary judgment in favor of appellees, because genuine issues of material facts remained to be resolved. We find this to be a highly unpersuasive argument.

The flaws in the Oklahoma Act were apparent on its face. Many were identical to those identified by the Supreme Court in *MITE.* There was no need for factual elaboration of the actual pattern of enforcement of the Act.

Nor was there a factual dispute as to the steps taken by the offerors. They concededly commenced tender offers without first complying with the Oklahoma Act. The Administrator refused to assure the district court that these offerors would not be subject to penalties for their failure to comply. The precarious position of the offerors, and their need for injunctive relief, was manifest.

We hold that there was no need for a full trial and that summary judgment was appropriate in each case.

(E)

■ Finally, the Administrator challenges the district court's entry of a prelim-

inary injunction in favor of Mesa on the ground that the court failed to make certain required findings. The Administrator is correct in pointing out that the district court was required, under Fed.R.Civ.P. 52(a) and 65(d), to make findings of fact and conclusions of law at the time it entered the preliminary injunction. The question before us, however, is whether this omission was harmless in view of the clear applicability of *MITE.* We hold that it was harmless.

The requirements of findings of fact and conclusions of law serve essentially two purposes: first, they give the parties a clearer understanding of the decision rendered; and, second, they aid the appellate court by specifying the basis for the district court's decision. *LaSalle Extension Univ. v. FTC,* 627 F.2d 481, 485 (D.C.Cir.1980); *Leighton v. One William Street Fund,* 343 F.2d 565, 567 (2d Cir.1965).

Here there was no possibility of confusion as to the basis for the judgments below. The district court concluded that the Oklahoma Act was flawed by the same corresponding infirmities that had been found to violate the commerce clause in *MITE.* Indeed, the Supreme Court, in dealing with the similar Illinois Act, had enumerated the specific offending provisions of that Act, many of which were tracked by the Oklahoma Act. Since our ruling on the constitutionality of the statute turns completely on our interpretation of the Oklahoma Act on its face, we presumably are in as good a position to do so as the district court. After all, an appellate court is supposed to be able to read a statute. Under the circumstances here, specific findings were not required for the performance of our appellate function.

Similarly the position of Mesa is uncontroverted; it would have been subject to penalties for non-compliance with the Oklahoma Act. Moreover it is clear from the record that the Administrator could not guarantee that an enforcement action

injunction to enjoin enforcement of the Oklahoma Act validly could have been issued. We disagree. A potential future declaration of the Act's invalidity would not have prevented the Administrator from commencing an action in

the state court seeking penalties for the offerors' violations of the Oklahoma Act. The legal remedy, if the Declaratory Judgment Act indeed does provide a "legal" remedy, did not provide adequate protection for the offerors.

against Mesa would never be brought. The case in this respect falls squarely within *MITE.*

In view of the clear applicability of this controlling Supreme Court precedent, we hold that the absence of specific findings is harmless. The parties, and we, are fully informed as to the basis for the preliminary injunction entered by the district court. *See Anderson v. City of Albuquerque,* 690 F.2d 796, 803 (10th Cir.1982); *Lujan v. State of New Mexico Health & Social Services Dept.,* 624 F.2d 968, 970 (10th Cir. 1980); *Featherstone v. Barash,* 345 F.2d 246, 250 (10th Cir.1965); *First National Bank of Fort Smith, Ark. v. Mattingly,* 312 F.2d 603, 605 (10th Cir.1963); *LaSalle Extension University v. FTC, supra,* 627 F.2d at 485.[15]

Affirmed.

---

15. In like vein, the Administrator also contends that the district court's preliminary injunction is defective because of its failure to state specifically its findings on irreparable injury and lack of adequate legal remedies. True, neither injury nor legal remedies is mentioned in the order. But the court did state that it was relying on *MITE,* in which the Supreme Court implicitly held, in affirming the grant of injunctive relief, that these requirements were met. The district court plainly was warranted in taking its lead from *MITE.* This dispositive Supreme Court precedent gave the parties ample notice of the basis for the injunction. Under the Federal Rules no particular talismanic words need be invoked. "Every order granting an injunction shall set forth the reasons for its issuance; shall be specific in its term; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained...." Fed. R.Civ.P. 65(d). Since the grounds for the injunction were manifest in the citation to the closely analogous *MITE* case, the failure expressly to recite findings on irreparable injury and lack of legal remedies was harmless. *See Rowley v. McMillan,* 502 F.2d 1326, 1334 (4th Cir.1974).