MESA PARTNERS II, Plaintiff,

v.

UNOCAL CORPORATION, a corporation, Hamp Baker, Norma Eagleton and James Townsend, the duly elected members of the Oklahoma Corporation Commission; and Michael C. Turpen, Attorney General of the State of Oklahoma, Defendants.

No. CIV–85–398–W.

United States District Court, W.D. Oklahoma.

April 26, 1985.

Burck Bailey, Warren F. Bickford, IV, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., for plaintiff.

Harry A. Woods, Jr., John J. Griffin Jr., James U. White, Candace M. Williams, Mark S. Grossman, Crowe & Dunlevy, C. Raymond Patton, Jr., Adm'r of the Okl. Dept. of Sec., George R. Barr, Jr., John D. Rothman, Asst. Attys. Gen., Michael C. Turpen, Atty. Gen. of Okl., G. Gail Stricklin & Gretchen P. Hoover, Okl. Corp. Com'n., Oklahoma City, Okl., for defendants.

## ORDER

LEE R. WEST, District Judge.

Plaintiff, Mesa Partners II, filed a complaint on February 14, 1985, in this Court

seeking a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring the provisions of Oklahoma's "Energy Resources Conservation Act" (the Oklahoma Act) 1985 Okla.Laws, Ch. 2, to be codified as 52 O.S. § 601 et seq. (1985), and any rules and regulations promulgated thereunder, invalid and unconstitutional, insofar as they might be applied to plaintiff in connection with past or future acquisitions of common stock of defendant Unocal. Plaintiff joined as defendants Hamp Baker, Norma Eagleton, and James Townsend, duly elected members of the Oklahoma Corporation Commission, and Michael C. Turpen, Attorney General of the State of Oklahoma. The latter officials are the state authorities with power to enforce the provisions of the Oklahoma Act. Plaintiff sought a temporary restraining order, pending a hearing on application for preliminary injunction; upon hearing, a preliminary injunction; and upon trial of the case, a permanent injunction restraining enforcement of the Oklahoma Act insofar as it relates to any stock acquisition by plaintiff in defendant Unocal.

On February 19, 1985, all defendants entered into stipulations with plaintiff that they would not seek to enforce the provisions of the Oklahoma Act in any way until giving three business days notice to plaintiff; in exchange, plaintiff agreed to hold in abeyance its application for a temporary restraining order. On March 29, the Corporation Commission gave notice to plaintiff that it would proceed under the provisions of the Oklahoma Act. All parties appeared before this Court on April 8, 1985, at which time a temporary restraining order was refused; the matter was set for evidentiary hearing on the motion for preliminary injunction on April 11, 1985. At that hearing, this Court granted plaintiff's motion for preliminary injunction, with the understanding that a full articulation of the basis for the Court's ruling would be forthcoming.

At the hearing on plaintiff's application for preliminary injunction, plaintiff presented Mr. Michael Brown, manager of the West Coast Mergers & Acquisitions Department of Drexel Burnham Lambert Incorporated, the dealer-manager of plaintiff's tender offer for shares of Unocal Corporation. His testimony concerned the harm and injury which would be sustained by a tender offeror if the offer were to be subjected to delay or uncertainty in its timing beyond the deadlines imposed under the Williams Act amendments to the Securities Exchange Act of 1934. He also discussed the advantages to be gained by the target company in a tender offer situation from any available delaying tactics.

Defendants presented the testimony of Dr. Alexander Holmes, Professor of Economics at the University of Oklahoma, who testified as to the state's need to regulate its energy and hydrocarbon assets and the waste that could be caused by improvident extraction of these assets.

A number of exhibits pertaining to the tender offer, and to proceedings initiated by the Corporation Commission were introduced into evidence. Legal arguments were presented on behalf of plaintiff, Unocal Corporation and the Attorney General.

Plaintiff seeks preliminary injunctive relief, first on the grounds that the Energy Resources Conservation Act is unconstitutional under the Supremacy Clause of the United States Constitution, because it is preempted by the provisions of the Williams Act and regulations thereunder, and second, on the grounds that the operation of the Energy Resources Conservation Act would constitute an impermissible burden upon interstate commerce under the provisions of the United States Constitution. Defendants argue that the state law under attack is presumptively constitutional, that its effects on interstate commerce are only incidental, that it fairly regulates to effectuate a legitimate local public interest, and that said law therefore does not unconstitutionally burden interstate commerce. Defendants also argue that plaintiff is threatened with no irreparable injury if the injunction is not granted, and that plaintiff has failed to establish a reasonable probability for plaintiff's ultimate success on the

merits in this litigation. Plaintiff replies that the possibility of delay imposed on the tender offer is itself a sufficient showing that plaintiff is subjected to irreparable injury, citing *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), and *Mesa Petroleum Co. v. Cities Service Co.*, 715 F.2d 1425 (10th Cir.1983).

The delicate balance between state regulation of interstate commerce, either by direct or indirect methods, has been much before the courts in the context of corporate take-overs. *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Mesa Petroleum Co. v. Cities Service Co.*, 715 F.2d 1425 (10th Cir.1983). The United States Supreme Court in *MITE* closely examined the potential conflict between state regulation and the Commerce Clause. In examining the state-federal relationship with regard to commerce, the Supreme Court stated:

> Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it 'regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970), citing *Huron Cement Co. v. Detroit*, 362 U.S. 440, 443 [80 S.Ct. 813, 815, 4 L.Ed.2d 852] (1960).... The Illinois Act violates these principles for two reasons.... Second, the burden the Act imposes on interstate commerce is excessive in light of the local interests the Act purports to further.

*Edgar v. MITE*, 457 U.S. at 640, 102 S.Ct. at 2640.

## THE OKLAHOMA ACT

In examining the interference with interstate commerce which is indirectly caused by the Oklahoma Act, the salient features and history of the Oklahoma Act should be considered. The Act was introduced in the Oklahoma Senate on February 6, 1985, passed by the House of Representatives on February 13, 1985, and signed by the Governor on February 13, 1985, to be immediately effective due to the presence of the Emergency Clause. The Act is one in a series of legislative enactments which have as their primary or incidental purpose the regulation of national, interstate securities transactions, even though such transactions are being conducted in compliance with all applicable federal securities laws and regulations. Earlier efforts include Oklahoma Take-Over Bid Act, 71 O.S. §§ 431–450 (1981), held unconstitutional by the United States Court of Appeals in *Mesa Petroleum Co. v. Cities Services, Co.*, 715 F.2d 1425 (10th Cir.1983); the Oklahoma Multinational Corporation Take-Over Bid Act, 71 O.S.Supp.1980 §§ 414–421, held unconstitutional by this Court in *Seagram & Sons, Inc. v. Marley, et al.*, [1981 Transfer Binder] Fed.Sec.L.Rptr. ¶ 98,246 (W.D. Okla.1981).

The present Act differs from those held unconstitutional in other proceedings. Prior acts sought to grant authority to the state Securities Commission to prohibit or delay interstate tender offers. The focus of these acts was the protection of shareholders through adequate disclosure. See *Mesa*, and *Seagram*, *supra*. The Oklahoma Act herein involved has as its purpose the protection of energy resource assets from transfers that may retard the timely and efficient development of such assets, the prevention of waste of energy resources and the protection of sources of tax revenue derived from energy resource assets, section 602. To accomplish these purposes, the Act provides that the Corporation Commission of the State of Oklahoma shall either approve, disapprove, or conditionally approve all transfers relating to energy resource assets which are not specifically exempted by the Act, section 606(H). The exemptions include, *inter alia*,[1] transactions involving less than $75

---

1. The following transfers are exempted from the provisions of this act:

1. Transfers in the ordinary course of business. For the purposes of this act, transfers in

million in energy assets, or acquisition of ownership interests in persons other than natural persons in which a beneficial interest in excess of 10% would be owned by the transferee subsequent to the transfer, assuming that the transferor owned energy resource assets of $75 million, section 605.

Upon the making of an offer, solicitation of an offer, or agreement to effect a transfer, an application is to be filed with the Commission for approval, and the transferor is to be notified, section 606(B). The application is to contain detailed information as to the transferor and transferee, including future plans for development of energy resource assets and plans for future disposition, section 606(C). A transfer is to be approved by the Commission only if specific findings are made as to the impact of the transfer on development of resources, future resource management, conservation, and tax revenue, section 606(D). If the Commission determines that there are "no substantial issues requiring an application and hearing," the requirements may be waived insofar as application and

hearing are concerned and the matter may be decided on the basis of affidavit, section 606(E). In all other cases, a hearing will be held within ten calendar days of the filing date; a final adjudication is to be made within twenty days from the filing date, with the opportunity for appeal to the Oklahoma Supreme Court under the general provision for appeal of order of the Corporation Commission, section 606(E)(3). The Commission is given power to issue cease and desist orders pending adjudication, section 606(G); to adjudicate that the transfer does not meet statutory standards; to grant conditional approval, or to approve transfers, section 606(H). The Act provides for criminal sanctions, including fines and imprisonment, section 610. It also provides that the Commission has the authority to appoint a receiver to affect rescission of a transfer made in violation of the Act, section 609(2). A three year statute of limitations is provided for actions challenging the validity or effectiveness of any transfers, section 613.

the ordinary course of business shall include but not be limited to:

    a. the granting of a lease to explore and produce an energy resource asset,

    b. the assignment of a lease or leases to explore and produce an energy resource asset by or to a person engaged in the business of buying and selling such leases,

    c. the sale by a natural person of fee mineral rights,

    d. the transfer by conveyance or decree pursuant to a private trust, gift, will, or intestate succession,

    e. any transfer pursuant to a compulsory pooling order of the Commission,

    f. any transfer of hydrocarbons pursuant to a contract for the purchase, sale, or delivery of such hydrocarbons at or beyond the wellhead or other point of production,

    g. the transfer, sale condemnation or conveyance of surface use rights for the purposes of ingress, egress, easement and right-of-ways, and,

    h. sales in the ordinary course of business of pipeline equipment, oil and gas equipment and mineral equipment as defined in Section 371 of Title 52 of the Oklahoma Statutes;

2. The granting or assignment of a mortgage, security interest or other contractual lien in an energy resource asset as security for an indebtedness or the foreclosure, enforcement or realization thereof;

3. The granting or assignment of a royalty interest, overriding royalty interest, production payment, or other nonworking interest form of right to receive hydrocarbon production, or proceeds therefrom;

4. A transfer, as defined in subparagraph b of paragraph 4 of Section 3 of this act, where, after giving effect to the proposed transfer, the transferee would beneficially own less than ten percent (10%) of the ownership interest in the transferor;

5. A transfer, as defined in subparagraph a of paragraph 4 of Section 3 of this act, where the value of the energy resource assets at date of transfer is less than Seventy-five Million Dollars ($75,000,000.00);

6. A transfer, as defined in subparagraph b of paragraph 4 of Section 3 of this act, where the value at date of transfer of the energy resource assets owned by the transferor is less than Seventy-five Million Dollars ($75,000,-000.00);

7. A transfer of a "domestic public utility" or an ownership interest in a "domestic public utility", as defined in Section 191.1 of Title 17 of the Oklahoma Statutes; and

8. Any other exemptions as "may be granted pursuant to the rules, regulations and orders of the Commission reasonably prescribed in the furtherance of this act." 1985 Okla.Laws, Ch. 2, section 5, to be codified as 52 O.S. § 605 (1985).

## THE COMMERCE CLAUSE CHALLENGE

■ The test for a valid state regulation with an incidental affect on interstate commerce enunciated by the United States Supreme Court in *Pike v. Bruce Church* is that the state statute "regulates evenhandedly to effectuate a legitimate public interest, and its effects on interstate commerce are incidental." It cannot be denied that the State of Oklahoma has a valid and legitimate public interest in its natural energy resources. However, this Court must balance the "evenhanded state regulation" called for by *Pike v. Bruce Church* with the effects on interstate commerce. In looking at evenhanded regulation, this Court cannot ignore the fact that there are eight classes of exemptions granted from the operation of the Oklahoma Act, section 605. (*See* footnote 1). These include all transfers in the ordinary course of business, including assignment of lease or leases to explore or produce energy resource assets by or to a person engaged in the business of buying and selling such leases. Also exempted are all transactions relating to granting or assignment of mortgages, security interests, or other contractual liens relating to energy resource assets. The last exemption includes "any other exemptions as may be granted pursuant to the regulations and orders of the Commission reasonably prescribed in the furtherance of this act." These exemptions contain no dollar amount limitation.

Since all "ordinary course of business" transfers and all secured interest transfers are exempted, and all transfers involving less than $75 million in energy resource assets, or transfers resulting in less than 10% ownership in an entity holding at least $75 million in resource assets are likewise

exempted, what is it that is being evenhandedly regulated by the state? Only the direct transfer of $75 million in energy resource assets to a non-industry transferee, or the change of ownership in an entity owning or controlling $75 million in energy resource assets in which the transferee emerges with a beneficial interest of 10% or more of such entity. This narrow range of transactions subject to scrutiny does not seem to be evenhanded conservation regulation, as the defendants would contend. Any true conservation legislation so riddled with exemptions, exceptions, and limitations does not realistically seem to be structured with conservation as its main goal. It is significant that all time periods are carefully tailored to coincide with the time limitations established by the Williams Act. Section 606(F) sets a time limit of twenty calendar days after filing of the application for making of final adjudications. Thus, it is clear that one of the main effects of the Oklahoma Act is to subject to scrutiny those interstate tender offers for corporate stock of entities holding natural energy resource assets in the state of Oklahoma.

And what is the effect on the interstate stock transaction which falls within the purview of the Act? The Act subjects the parties to the requirement of filing an application (section 606(B) and (C)), or the filing of affidavits in lieu thereof (section 606(E)); a filing fee of $5,000, together with any additional costs actually incurred (section 607(A) and (B)); [2] the possibility of a hearing (section 606(E)(2)); the possibility of criminal fines and imprisonment for failure to comply (section 610); the uncertain effect of a negative adjudication (section 606(H)); the possibility of an appeal to the Oklahoma Supreme Court (section 606(E)3);

2. With regard to the dollar cost to be imposed on the parties under the provisions of the Oklahoma Act, section 606(I) contains the following provision:

"I. For the purposes of complying with and performing its responsibilities within the time limits prescribed by this act, the Commission may contract for such professional and technical services as are necessary to complete the hearing and determination process in accord-

ance with the provisions of the act. In contracting for such necessary services the Commission shall be exempt from the competitive bidding requirements of Section 85.7 of Title 74 of the Oklahoma Statutes."

This openended grant of contracting power to the Commission could result in substantial costs being imposed upon the parties to the interstate transaction.

the possibility of the appointment of a receiver to affect a rescission of a transfer made in violation of the Act (section 609(2)); all actions challenging the validity of a transfer under the Act can be commenced for a period of three years after the effective date of the transfer (section 613).

■ In considering all aspects of this legislation, this Court finds that the burden on interstate commerce outweighs any evenhanded regulation of energy resource assets consistent with a local public interest. The laws of the state of Oklahoma provide a number of provisions relating to conservation. The Corporation Commission may establish drilling and spacing units for the production of oil and gas, 52 O.S. § 87.1 (1984); and may establish production allowables to prevent waste, 52 O.S. § 87.1 (1984); § 274 (1981). Fieldwide unitization of common sources of supply may be ordered. 52 O.S. §§ 287.1 through 287.15 (1981). Such regulations can and do effectively prevent the too-rapid wasteful production that the Act under consideration purports to have as a primary concern. None of the many statutory authorizations for conservation are riddled with the numerous exceptions found in the provisions of the Oklahoma Act herein considered, nor do they impose such a heavy burden on interstate commerce.

This Court is not insensitive to the importance to the state of Oklahoma of proper regulations concerning natural energy resource assets. Nor is the Court unmindful of the need to keep a proper balance in the realm of federal-state interaction. The Court is also aware that the issue of pre-emption and the effect of the Supremacy Clause of the United States Constitution were not deemed controlling by a majority of the United States Supreme Court in *MITE*. The Court also acknowledges that the Oklahoma Act herein involved does not purport to deal directly with the realm of disclosure or approval of securities offerings as did the offending legislation in *MITE*, *Mesa*, and *Seagram*. However, the Court cannot ignore the fact that the timing of the decisions under the Oklahoma

Act has been closely tailored so as not to conflict with the timing of decisions under the Williams Act. This leads the Court to believe that the real target of the Act is not only the protection of energy resource assets, but also the potential slowdown and chilling effect on take-over bids in a way which unconstitutionally impinges on the power of the Congress acting under the Commerce Clause.

In dealing with the assets of corporations subject to take-over bids, the Court can easily imagine a scenario in which any number of states could assert substantial interest in regulating the assets subject to ownership by the transferor corporation. Oklahoma is not the only state with energy resource assets. Texas, California, Louisiana, Wyoming, Utah, New Mexico, Arkansas, and other come rapidly to mind. If a corporation, operating in a proper manner under all laws of the United States Congress which have Commerce Clause authority to regulate interstate transactions, were to be made subject to laws of uncertain effect in each state having a local interest, interstate tender offers for shares of corporate stock could grind to a whining halt. As the United States Supreme Court said in *MITE*,

"The effects of allowing [blocking of] a nationwide tender offer are substantial. Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced." 457 U.S. at 643, 102 S.Ct. at 2642.

All of the advantages of a proper interstate tender offer alluded to by the Supreme Court could be nullified by state laws which impinge indirectly in a burdensome manner on the Commerce Clause. The Oklahoma Act is such a state law.

When balancing the burden on interstate commerce with the conservation implications of the Oklahoma Act, this Court finds

that the Act must fail, since the burdens on the buying and selling of securities could delay and frustrate the nationwide tender offers, in contravention to the principles enunciated by *MITE* and *Mesa.*

## PROPRIETY OF PRELIMINARY INJUNCTION

■ Defendants have raised several challenges with respect to the propriety of granting a preliminary injunction prohibiting the enforcement of the Oklahoma Act against Mesa Partners II. They argue that Mesa failed to make a showing of the irreparable harm which is the basis for granting a preliminary injunction. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). At the time of the hearing, plaintiff had acquired an interest in excess of 10% of Unocal stock by purchases in the open market. Plaintiff had also announced a tender offer for 64,-000,000 shares of Unocal stock. Plaintiff had been served with an application for an order from the Oklahoma Corporation Commission to appear and show cause for its non-compliance with the provisions of the Oklahoma Act. As the Court of Appeals for the Tenth Circuit pointed out in *Mesa,* fatal delays might have resulted from the Commission's actions if the transferees had been forced to comply with the Act. The Court of Appeals further stated:

> "Since the Supreme Court implicitly has recognized that potential prosecution for failure to comply with a state take-over statute is the sort of threatened harm that warrants injunctive relief, and since Mesa certainly had a substantial likelihood of success on the merits, we cannot say that the district court abused its discretion in granting the preliminary injunction in favor of Mesa. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir. (1980)), *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 781 (10th Cir.1964) (per curiam)."

The threatened prosecution under this Act is no less real than that in the take-over statute under consideration in *Mesa.* Thus,

plaintiff has made the requisite showing of irreparable harm which justified the granting of a preliminary injunction.

## DEFENDANTS' MOTION TO MODIFY

Subsequent to the hearing and granting of preliminary injunction in this case, the defendants filed a Motion to Modify, or in the Alternative, to Partially Stay Effect of Preliminary Injunction Pending Appeal. In that motion, defendants requested that the effect of the preliminary injunction be limited to the enforcement of section 6(A), 6(G), and the first section of section 6(H), and all of sections 8, 9, 10, and 11 of the Oklahoma Act. Plaintiff has responded in opposition to such motion.

In ruling on defendants' motion, the Court has carefully considered the opinion of the Court of Appeals in *Cardiff Acquisitions, Inc., et al. v. Hatch,* 751 F.2d 906 (8th Cir.1984). In that case, state legislation which required disclosure under the security laws for protection of state investors was found not to unduly burden interstate commerce within the *MITE* doctrine. The legislation in that case had been carefully drafted to limit its effect on interstate commerce. The Act, and its application, was limited to the filing of factual disclosure statements to aid shareholders in making up their minds as to the tender offer under scrutiny. The Court of Appeals held that any acts of the Commissioner which called for evaluative statements to be filed, as distinguished from factual disclosure, were unauthorized under the Minnesota act.

■ If defendants' motion were granted, the following aspects of the Oklahoma Act would be left in place: the few transactions not exempted from operation of the act would be required to proceed with the application (or alternate affidavit) procedure outlined by section 606(B) through (F); could be required to amend the provisions relating to the transfer under section 606(H); would be liable for costs and filing

fees under section 607 and 606(I); and would agree to submit to the jurisdiction of the Oklahoma Corporation Commission and the courts of the state under section 612. The legislature has provided that the provisions of the Act are severable, and that if any part be held void, the holding shall not affect or impair the remaining provisions of the Act. (Section 15, 1985 Okla.Laws, Ch. 2.) The presence of a severability clause gives rise to a presumption that the legislature would have adopted the Act with the unconstitutional provisions omitted. *Engelbrecht v. Day*, 201 Okl. 585, 208 P.2d 538 (1949).

The problem facing this Court in applying the severability clause to the Oklahoma Act is that the concepts of approval and disapproval are linguistically woven into the various sections of the Act. Section 606(B), which defendants request be left in effect, calls for the filing of "an application *for approval*"; section 606(C) defines the contents of the "application *for approval*", section 606(E)(2) requires the holding of a hearing and (3) allows an appeal by "any person aggrieved" to the Supreme Court of Oklahoma. Section 606(F) calls for "final *adjudications*", and section 606(H) allows the Commission to require amendments to the *transfer* in certain respects, "including personnel qualifications and policies and practices affecting the exploration, development and production of energy resource assets." If all of the above portions of the Act remain intact, there is sufficient language to infer the power in the Commission to adjudicate some issue as to the propriety of the transfer, and to require amendments to the transfer materials. This is not the incidental burden on interstate commerce which the Court of Appeals found present in the disclosure requirements of *Cardiff*. Section 606 of the Act creates a sufficient uncertainty as to the requirements placed on an interstate tender offer to offend the ruling in *Mesa* and *MITE*. Defendants' motions are therefore DENIED.