TLX ACQUISITION CORPORATION, TLX Partners, Datapoint Corporation, and Intelogic Trace, Inc., Plaintiffs,

v.

The TELEX CORPORATION, Robert Henry, Attorney General of the State of Oklahoma, Jeanette B. Edmondson, Secretary of State of the State of Oklahoma, Susan Bryant, Administrator of the Department of Securities of the Oklahoma Securities Commission, Defendants.

No. CIV–87–2056–R.

United States District Court, W.D. Oklahoma.

Nov. 3, 1987.

James P. Linn and B.J. Rothbaum, Jr., Linn & Helms, Oklahoma City, Okl., and John S. Martin, Jr., Schulte, Roth & Zabel, New York City, for plaintiffs.

Joel L. Wohlgemuth, Norman, Wohlgemuth & Thompson, Tulsa, Okl., Robert H. Henry, Atty. Gen., and Robert A. Butkin, Asst. Atty. Gen., Oklahoma City, Okl., for defendants.

## ORDER

DAVID L. RUSSELL, District Judge.

Before the Court is the application of Plaintiffs TLX Acquisition Corporation,

TLX Partners, Datapoint Corporation and Intelogic Trace, Inc. (collectively "TLX et al.") for a temporary restraining order restraining Defendants The Telex Corporation ("Telex"), Robert Henry, Attorney General of the State of Oklahoma, and Jeannette B. Edmondson, Secretary of State of the State of Oklahoma and Susan Bryant, Administrator of the Department of Securities of the Oklahoma Securities Commission (collectively the "Government Defendants"), from attempting to apply, invoke or enforce the Oklahoma Control Shares Acquisition Act, 1987 Okla.Sess. Laws ch. 146, § 15 et seq., to be codified as Okla.Stat. tit. 18, § 1145 et seq. (sometimes referred to hereinafter as the "Oklahoma Control Shares Act" or "Control Shares Act").[1] The temporary restraining order sought is ancillary to Plaintiffs' action seeking a declaratory judgment declaring the Oklahoma Control Shares Act facially unconstitutional and as applied to Plaintiffs, their acquisition of Telex stock pursuant to their tender offer and/or to a merger of Telex and TLX Acquisition Corporation. Plaintiffs allege in their complaint that the Oklahoma Control Shares Act is unconstitutional both under the Commerce Clause and under the Supremacy Clause of the United States Constitution, under the latter clause by virtue of pre-emption by the Williams Act, 82 Stat. 454, as amended, 15 U.S.C. § 78m(d)–(e) and 78n(d)–(f). However, Plaintiffs confine their arguments concerning their likelihood of success on the merits supporting the application before the Court to the statute's infirmity under the Commerce Clause.

In addition to an order restraining Defendants from invoking the Control Shares Act, Plaintiffs seek an order restraining and enjoining Defendants from commencing an action in any other forum to invoke, apply or enforce that Act, to enjoin the acquisition or merger or to litigate any other issues related to Plaintiffs' acquisition, merger or the Control Shares Act.

### The Oklahoma Control Shares Acquisition Act

The Oklahoma Control Shares Acquisition Act is the latest of a series of antitakeover statutes enacted by the Oklahoma legislature, all but one[2] of which have been previously determined to be unconstitutional.[3] The Act applies to acquisition of shares of stock in a public corporation where such acquisition is for the purpose of and would result in the acquisition of at least either one-fifth, one-third or a majority of the voting power of that corporation, see 1987 Okla.Sess.Laws ch. 146, §§ 15, 16, if the public corporation has one hundred or more shareholders; and has its principal place of business, its principal office or substantial assets in Oklahoma; and one of the three following conditions is met: 1) more than ten percent (10%) of the corporation's stockholders reside in Oklahoma; b) more than ten percent (10%) of its shares are owned by Oklahoma residents; or c) ten thousand shareholders resident in Oklahoma. 1987 Okla.Sess.Laws ch. 146, § 18. If the foregoing conditions are met, the Act applies and provides that unless the issuing corporation's certificate or bylaws provide otherwise prior to a "control share acquisition,"[4] the control shares acquired by the

---

1. Plaintiffs also requested in their application that Defendants be restrained from enforcing the Oklahoma Take-over Disclosure Act of 1985, Okla.Stat. tit. 71, § 451 et seq. That issue is not now before the Court, the parties having agreed that that Act does not apply to Plaintiffs' tender offer because Oklahoma residents do not beneficially own at least twenty percent of the stock in the Telex Corporation. See also D.Ex. 2.

2. The Oklahoma Take-over Disclosure Act of 1985, Okla.Stat. tit. 71, § 451 et seq.

3. See Mesa Petroleum Co. v. Cities Service Co., 715 F.2d 1425 (10th Cir.1983) (affirming this Court's holding that the Oklahoma Take-over Bid Act, Okla.Stat. tit. 71, § 431 et seq. (since

repealed by 1985 Okla.Sess. laws ch. 285, § 16) was unconstitutional under the Commerce Clause of the United States Constitution); Mesa Partners II v. Unocal Corp., 607 F.Supp. 624 (W.D.Okla.1985) (holding the Energy Act, Okla. Stat. tit. 52, § 601 et seq. void); Joseph E. Seagram & Sons, Inc. v. Marley, [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,246 (W.D. Okla.1981) [Available on WESTLAW, 1981 WL 1964] (holding the Oklahoma Multinational Corporation Take-over bid Act, Okla.Stat. tit. 71, § 414 et seq. unconstitutional).

4. See 1987 Okla.Sess.Laws ch. 146, § 16.

acquiror will have only such voting rights as are granted by a resolution approved 1) by a majority of the votes within each voting group entitled to vote separately on the proposal, excluding all interested shares; *and* 2) if the proposed acquisition would, if consummated, result in any of the changes described in Okla.Stat. tit. 18, § 1077(B)(2), by a majority of the holders of outstanding shares of all classes that are entitled to vote as a class. 1987 Okla. Sess.Laws ch. 146, §§ 19 and 23. "Interested shares" for purposes of ascertaining how the requisite majority of stockholder approval under the first condition is determined, are shares of the corporation for which an acquiring person or group or any officer or employee who is also a director of the corporation may exercise or direct the exercise of attendant voting power of the corporation in the election of directors. 1987 Okla.Sess.Laws ch. 146, § 17. The shareholder vote on the resolution regarding the voting rights to be accorded the acquiror's control shares is not required to be taken until the next special or annual meeting of shareholders, unless the acquiring person delivers an "acquiring person statement," [5] requests a special meeting of stockholders and within ten days thereafter gives an undertaking to pay the corporation's expense of the special meeting. *See* 1987 Okla.Sess.Laws ch. 146, §§ 20, 21. In that event, the directors of the target corporation *must* call a special meeting of shareholders, to consider the voting rights to be accorded the shares acquired or to be acquired by the acquiror, within no more than fifty days after receipt of the request, and if the acquiror also so requests in writing at the time of delivery of the acquiring person statement, the required special meeting may not be held sooner than thirty days after receipt of the statement. 1987 Okla.Sess.Laws ch. 146, § 21.

### The Parties' Arguments

Plaintiffs TLX et al. assert that the Control Shares Act is unconstitutional under the Commerce Clause because it purports to regulate the internal affairs of corporations, in this instance Telex, incorporated in states other than Oklahoma, and further, that it purports to regulate nationwide tender offers for the stock of "out-of-state" corporations. Plaintiffs assert that the United States Supreme Court's decisions in *CTS Corporation v. Dynamics Corporation of America*, 481 U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) and in *Edgar v. Mite Corporation*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) compel this conclusion.

In addition to the foregoing arguments demonstrating Plaintiffs' likelihood of success on the merits, Plaintiffs contend that they are threatened with and will suffer irreparable harm in two ways if Defendants are permitted to enforce the Control Shares Act. First, "economic disincentives" of the Act threaten to preclude Plaintiffs from proceeding with their tender offer to their irreparable economic detriment and that of the shareholders of Telex who will be deprived of an opportunity to obtain a premium for their shares. Plaintiffs' Brief at 24. Alternatively, if Plaintiffs proceed with the tender offer but their shares are denied voting rights in a resolution pursuant to the Control Shares Act, the purpose of Plaintiffs' acquisition of a controlling interest—to direct the affairs of the corporation—will be defeated, Plaintiffs will be deprived of the real benefits of their stock ownership, and the acquisition will be rendered an economic disaster. *See* Plaintiffs' Brief at 24–25 and Affidavit of Asher B. Edelman in Support of Motion for Declaratory Judgment and Preliminary and Permanent Injunctive Relieve at ¶ 4. In the affidavit supporting the requested relief, Mr. Edelman states that it will not be possible to obtain financing for a tender offer unless the financing is conditioned upon a determination that the acquired shares will have voting rights free of any strictures of the Control Shares Act. Affidavit at ¶ 6. Acknowledging that before issuing the requested relief, the Court must be satisfied that the public interest will not be disserved thereby, Plaintiffs

---

5. *See* 1987 Okla.Sess.Laws ch. 146, § 20.

address no arguments specifically to this issue.

Defendant Telex asserts that the Oklahoma Control Shares Act is on its face identical to the Indiana Control Shares Acquisition statute which the Supreme Court upheld against a Commerce Clause challenge in *CTS Corporation v. Dynamics Corporation of America*, 481 U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). Attempting, however, to circumvent the Supreme Court's focus, in the *CTS* decision, on the fact that the Indiana Act only applies to corporations incorporated in Indiana, Defendant Telex urges that the substantial nexus between Oklahoma, Telex, and Telex shareholders gives Oklahoma a sufficient interest in protecting resident shareholders to regulate a nationwide tender offer consistent with the *CTS* decision:

> Plaintiffs have overlooked the fact that the Supreme Court upheld the [Indiana] statute not only because it purported to define a state's governance of its corporations, but because it also sought to shelter its resident shareholders. As the Court stated, "Congress has never questioned the need for regulation of these matters." Because the Oklahoma Act is narrowly tailored to protect the interests of its resident shareholders and does not interfere with interstate commerce, it should be upheld. Defendant Telex's Brief at 21 (citations and footnote omitted)

Defendant Telex asserts that the irreparable harm Plaintiffs claim they will sustain if the Control Shares Act applies is only hypothetical and insufficient to warrant preliminary injunctive relief. Moreover, it urges that the public and Telex shareholders would be disserved by delaying enforcement of legislation which was designed to protect shareholders from abusive take-over tactics.

The Government Defendants, whose involvement in the case arises from their obligation to enforce the state statute, the constitutionality of which is questioned, address in their brief only the likelihood of Plaintiffs' success on the merits. Acknowledging that the Indiana statute upheld in the *CTS* decision applied only to corporations incorporated in Indiana, whereas the Oklahoma statute appears to apply to corporations regardless of their state of incorporation, the Government Defendants say that this distinction does not necessarily render the Oklahoma statute unconstitutional under the Supreme Court's analysis in the *CTS* case. The Government Defendants, like Defendant Telex, hinge their argument that the statute is constitutional on the following language in the *CTS* decision:

> Moreover, unlike the Indiana statute invalidated in MITE, the Indiana Act applies only to corporations that have a substantial number of shareholders in Indiana. Thus, every application of the Indiana Act will affect a substantial number of Indiana residents, whom Indiana indisputably has an interest in protecting. *CTS Corporation v. Dynamics Corporation of America*, 481 U.S. at ——, 107 S.Ct. at 1652, 95 L.Ed.2d at 88.

The Government Defendants contend that the state of incorporation is "arguably" only one factor to be considered in determining the constitutionality of the statute and that Telex's incorporation outside of the state "is only a legal technicality which is irrelevant" to all of its other ties to the state, including ties not analyzed by the Supreme Court in the *CTS* case. Government Defendants' Brief at 20–21. The Government Defendants contend that all of these ties [6] provide Oklahoma with a suffi-

---

**6.** These ties include Telex's principal place of business and all of its officers, employees and assets, which are located in Oklahoma. *See* D.Ex. 1, Affidavit of S.J. Jatras at ¶ 4. Telex is a holding company which has two wholly-owned subsidiaries: Telex Computer Products, Inc., an Oklahoma corporation, and Telex Communications, Inc., a Delaware corporation. *Id.* at ¶ 3. Telex operates exclusively in Oklahoma. *Id.* at

¶ 7. Its Oklahoma subsidiary's operations are worldwide but it maintains its worldwide headquarters in Oklahoma. *Id.* at ¶¶ 7 and 8. The Oklahoma subsidiary accounts for approximately ninety-one percent (91%) of Telex's revenues, the same percentage of its pre-tax income and approximately ninety-two percent (92%) of Telex's assets. *Id.* at ¶ 5.

cient nexus with Telex to apply its Control Shares Act and that moreover, the state's legitimate interest in "protecting shareholders, businesses, and communities within the state outweighs any impact on interstate commerce that might result" from the statute's application in this case. *Id.* at 21.

In reply, Plaintiffs TLX et al. argue that a state's power to regulate the affairs of corporations incorporated in that state—the internal affairs doctrine—was the linchpin or *sine qua non* of the Supreme Court's decision in the *CTS* case. They also point out that the Supreme Court of Delaware, the state of Telex's incorporation, recently ascribed constitutional significance to the internal affairs doctrine, citing *McDermott, Inc. v. Lewis*, 531 A.2d 206 (Del.1987).

Defendant Telex in surreply says that both the *McDermott* case and the *CTS* case support Telex's position that its nexus with Oklahoma is so substantial[7] that neither the Constitution or the internal affairs doctrine is violated by application of the Oklahoma statute. Moreover, Defendant Telex reasons that since the State of Delaware does not have a statute comparable to or conflicting with Oklahoma's statute and "no state has contacts with Telex greater than those of Oklahoma which would justify its overriding Oklahoma's legitimate concerns and interests," there is no danger of conflicting laws to which the Supreme Court adverted in the *CTS* case.

*Arguments and Evidence Presented at the Hearing on October 26, 1987*

At the hearing on Plaintiffs' application for a temporary restraining order, all parties made oral arguments. Plaintiffs offered into evidence the affidavit of Peter Chiappetta, managing director of Shearson Lehman Brothers, Inc. ("Shearson Lehman") (Pl.Ex. 1) and copies of Schedules 13D and 14D–1 of Asher B. Edelman, TLX Acquisition Corp. and TLX Partners filed with the Securities and Exchange Commission on October 9, 1987 (Pl.Ex. 2). Defendant Telex offered into evidence the Affida-

vit of S.J. Jatras, chairman of the board of directors and chief executive officer of Telex (D.Ex. 1) (previously made a part of the record in this case by attachment to Defendant Telex's Surreply Brief) and its answers to Plaintiffs' interrogatories (D.Ex. 2). Defendant Telex did not object to the introduction in evidence of Mr. Chiappetta's affidavit in lieu of his direct testimony provided it could cross-examine Mr. Chiappetta, who was present at the hearing.

In his affidavit, Mr. Chiappetta states that if the Control Shares Act is applicable to Plaintiffs' take-over attempt, Shearson Lehman will not provide the financing required to consummate the tender offer, see Pl.Ex. 1 at ¶ 5, but makes it clear that at this juncture Shearson Lehman has agreed to serve as exclusive financial agent to TLX Partners and its affiliates in connection with the tender offer pursuant to an engagement letter which would *permit* TLX Partners to *request* from Shearson Lehman a commitment letter by which Shearson Lehman *would* commit to provide six hundred million dollars' ($600,000,000) worth of financing. *Id.* The *proposed* commitment letter would make this financing contingent upon Plaintiffs' acquisition of sufficient shares, with the unfettered right to vote the same, to affect a short-form merger of Telex into the acquiring corporation without shareholder approval. *Id.*

The focus of Defendant Telex's inquiry, on cross-examination of Mr. Chiappetta, was whether Shearson Lehman would provide financing for Plaintiffs' acquisition of a controlling share of Telex stock large enough to effect a short form merger if, by stockholder resolution pursuant to Section 23 of the Oklahoma Control Shares Act, Plaintiffs obtained voting rights. *See* Tr. at 29–35. Mr. Chiappetta acknowledged that if Plaintiffs acquired voting rights by a disinterested stockholder resolution *and* "that's a condition of a transaction that [Plaintiffs] propose[s] to us," he "would presume depending on market conditions at the time ... we'd probably fund." Tr. at

7. *See supra* note 6.

35. Upon "re-direct" examination, Mr. Chiappetta testified that when a tender offer is extended much beyond the 20-day minimum period to consummate it, risk is interjected in the transaction in the form of the potential for intervening changes in the market conditions, the business climate, and a change in the business of the target company which he implied may affect the success of the tender offer and/or the willingness of investment bankers to finance the tender offer and hence, the ability of the acquiror to obtain financing for the offer. *See* Tr. at 36-37. In the context of the tender offer in issue, Mr. Chiappetta explained that Plaintiffs have already paid Shearson Lehman one and one-half million dollars ($1,500,000) to act as Plaintiffs' investment advisor and to insure a prompt response to a request for a funding commitment. Tr. at 37. To obtain the actual commitment to fund approximately six hundred million dollars ($600,000,000) to purchase stock for which the tender offer has been made, Plaintiffs will have to pay a total of six million dollars ($6,000,000), with the initial fee of one and one-half million dollars ($1,500,000) credited toward that amount. Tr. at pp. 37-38. Currently, if the other conditions of the tender offer are met, this payment would occur on or about November 6, 1987, when the tender offer is scheduled to close. *See* Tr. at 38-39 and 42. If the Control Shares Act applies and Plaintiffs had to await a 50-day period to determine whether shares they would acquire pursuant to the tender offer would have voting rights, Mr. Chiappetta testified that one of two things would have to occur: either Plaintiffs would have to pay a large commitment fee to assure that the funding would be provided after the delay or a new financing proposal would have to be made and the commitment to finance deferred until after the voting rights determination on such market conditions as might then exist. *See* Tr. at 38-39. Mr. Chiappetta also testified that the tender offer price was set in relation to the market price of Telex on the day the tender offer was made. Tr. at 40. On recross-examination, Mr. Chiappetta admitted that he had no idea whether the cost for a financing commitment would change if Plaintiffs extended the period of the tender offer to await a shareholder vote under the Control Shares Act. Tr. at 42.

Defendant Telex was granted the opportunity to submit a counter-affidavit in response to Mr. Chiappetta's affidavit. Telex elected not to file any additional affidavits for the Court's consideration.

During opening and closing statements at the hearing, all parties further elaborated the arguments made in their briefs. Plaintiffs argued that while the state of incorporation could certainly enact and apply a law like the Oklahoma law, if states having the threshold number or percentage of the target's shareholders or percentage of shares owned by its residents, without regard to incorporation, are permitted to enforce laws such as Oklahoma's, conceivably numerous states, in this instance perhaps 19 states, could attempt to regulate corporate control, creating an impermissible burden on interstate commerce. *See* Tr. at 14-15. Plaintiffs underscore this burden by pointing out that if several states having a threshold nexus with the take-over target enact laws like Oklahoma's, a potential acquiror will not know which law will ultimately govern the voting rights of control shares acquired or to be acquired and for that matter, whether any given state's law will even apply. *See* Tr. at 18. Plaintiffs point out that they had to submit interrogatories to Defendant Telex even to ascertain whether Oklahoma's Control Shares Act was potentially applicable. *Id.* Plaintiffs assert that they have rights under federal securities laws to acquire stock in a nationwide tender offer, denial of which rights would itself constitute irreparable harm. Tr. at 47. Additionally, extending the tender offer period until it is ascertained whether voting rights will be accorded the control shares 1) makes the offer more costly; and 2) increases the risk that the tender offer will not be consummated.

Defendant Telex argues that this controversy is not ripe and that no injunctive relief is required because Plaintiffs could extend their tender offer and condition it

on obtaining voting rights to shares to be acquired. Tr. at 19–21. If Plaintiffs lose that vote, Telex says then there may be a ripe controversy before the Court. Tr. at 21. Moreover, Defendant Telex suggests that the opt-out provision in the Oklahoma Control Shares Act somehow places the statute beyond the reach of the Commerce Clause or removes any constitutional infirmity that might otherwise exist in the statute but for the opt-out provision. *See* Tr. at 23–24. Defendant Telex also argues that implicit in the Supreme Court's failure to categorically state, in the *CTS* case, that only the state of incorporation may constitutionally enforce a statute like the Indiana Control Shares Acquisition statute, and its citation to the *Restatement (Second) of Conflict of Laws* § 304 (1971) is the notion that a state other than the state of incorporation might have a sufficiently important interest to the exclusion of all other states, to apply a control shares act to a corporation incorporated elsewhere without any risk of inconsistent obligations. Tr. at 57–58. Defendant Telex implies that that circumstance exists here, there being no evidence that any other state has a greater interest in regulating voting rights of control shares after a take-over than Oklahoma. *See* Tr. at 57–58.

The Government Defendants similarly argue that the internal affairs doctrine does not have constitutional stature. Tr. at 53–55. They urge on the basis of the *McDermott* case and the Supreme Court's citation to the Restatement provision in the *CTS* case that the laws of the state of incorporation regarding intra-corporate governance may be displaced where another state has a dominant or overriding local interest in the corporation's affairs. *Id.* Oklahoma has such an interest in Telex's affairs, they maintain. Tr. at 54 and 56. The possibility of conflicting obligations to which Plaintiffs allude does not exist in this case, according to the Government Defendants, because it is unlikely that a state other than Oklahoma could have sufficient Telex shareholders and a business and financial relationship to Telex sufficient to apply a law regulating the voting rights of shares acquired by a tender offer. Tr. at

54. The Government Defendants also urge that Plaintiffs failed to show any irreparable harm they are now faced with because it is not yet known whether shares acquired or to be acquired by Plaintiffs will be accorded voting rights by the shareholder resolution. Tr. at 55–56. Furthermore, the Government Defendants argue that the financial uncertainties of which they complain are inherent in take-overs and are no different than those undoubtedly extant in the delay necessary to obtain the stockholder resolution regarding voting rights under the Indiana statute which was held to be constitutional in the *CTS* case. *Id.*

## Analysis

Because Defendants received notice and Plaintiffs' application for a temporary restraining order is before the Court following an evidentiary hearing held approximately two weeks after the order was requested, in which hearing all parties participated, the Court will treat Plaintiffs' application for a temporary restraining order as a motion for a preliminary injunction, that is, subject to those standards that must be met for issuance of a preliminary injunction. *See Levas and Levas v. Village of Antioch, Illinois*, 684 F.2d 446, 448 (7th Cir.1982). *See generally* C. Wright & A. Miller, 11 *Federal Practice and Procedure: Civil* § 2951 at pp. 499–500 (1973) and C. Wright, A. Miller & F. Elliott, 11 *Federal Practice and Procedure: Civil* § 2953 at p. 156 (Supp.1987). *Cf. Sampson v. Murray*, 415 U.S. 61, 86–88, 94 S.Ct. 937, 951–952, 39 L.Ed.2d 166, 184–185 (1974) (a temporary restraining order continued beyond the 10–day period must conform to standards applicable to preliminary injunction).

In this circuit, issuance of a preliminary injunction requires a movant to make a prima facie showing that the following four criteria are satisfied: 1) the injunction would not be adverse to the public interest; 2) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; 3) the movant will suffer irreparable injury unless the injunction issues; and 4) there is

a substantial likelihood that the movant will prevail on the merits. *Amoco Oil Co. v. Rainbow Snow, Inc.,* 809 F.2d 656, 661 (10th Cir.1987), *citing Koerpel v. Heckler,* 797 F.2d 858, 866 (10th Cir.1986); *City of Chanute v. Kansas Gas and Electric Co.,* 754 F.2d 310, 312 (10th Cir.1985); and *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980).

■ With regard to the fourth criterion, the Court finds that plaintiffs have established that their success on the merits is probable. *See Citizens Concerned for Separation of Church and State v. City and County of Denver,* 628 F.2d 1289 (10th Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). Indeed, under the teachings of *CTS Corporation v. Dynamics Corporation of America,* 481 U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) and *Edgar v. Mite Corporation,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), Plaintiffs' success is certain. Both facially and if applied to Plaintiffs' acquisition of control shares of Defendant Telex pursuant to the tender offer, the Oklahoma Control Shares Act violates the Commerce Clause because the Act creates an impermissible risk of inconsistent regulation of tender offers and voting rights in stock by different states. Further, it imposes an indirect burden on interstate commerce that is excessive in relation to Oklahoma's interest in protection of resident shareholders and businesses, including those of Telex.

■ The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States." *U.S. Const.,* art. I, § 8, cl. 3. The Commerce Clause prohibits direct regulation of interstate commerce by states, *see Edgar v. Mite Corporation,* 457 U.S. at 640–43, 102 S.Ct. at 2639–41, 73 L.Ed.2d at 282–84; discrimination against interstate commerce by state regulations, *see CTS Corporation v. Dynamics Corporation of America,* 481 U.S. at ——, 107 S.Ct. at 1648–49, 95 L.Ed.2d at 84; state regulations that may adversely affect interstate commerce by subjecting activities to inconsistent burdens or obligations, *id.* and

cases cited therein; and state regulation which indirectly burdens interstate commerce to a degree which is excessive in relation to local state interests to be served by the regulation. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *see CTS Corporation v. Dynamics Corporation of America,* 481 U.S. at ——, 107 S.Ct. at 1649–52, 95 L.Ed.2d at 85–88; *Edgar v. Mite Corporation,* 457 at 643–46, 102 S.Ct. at 2641–43, 74 L.Ed.2d at 284–85.

No argument is made that the Oklahoma statute either directly regulates or discriminates against interstate commerce. It is on the latter two bases above that Plaintiffs claim the Control Shares Act is unconstitutional under the Commerce Clause.

■ Interstate transactions in stock in publicly held corporations traded on the national or regional stock exchanges, including those effected pursuant to a nationwide tender offer, are interstate commerce. *See Edgar v. Mite Corp.,* 457 U.S. at 642, 102 S.Ct. at 2640, 73 L.Ed.2d at 283. Defendant Telex is a corporation organized under the laws of the State of Delaware. *See* Pl.Ex. 2. Its common stock, of which there were approximately 14,674,911 shares outstanding as of June 30, 1987, *see* Pl.Ex. 2, Schedule 14D–1, Ex. (a)(1) (referencing Telex's Quarterly Report on Form 10–Q for the fiscal year ended June 30, 1987) is traded on the New York and Pacific Stock Exchanges. More than ten percent (10%) but less than twenty percent (20%) of the shares of Telex are owned by Oklahoma residents. D.Ex. 2. It necessarily follows that the remainder of Telex stock is owned by persons who reside in states other than Oklahoma. Plaintiff TLX Acquisition Corporation is a Delaware corporation, recently incorporated for the purpose of making the tender offer. Pl.Ex. 2, Schedule 14D–1, Ex. (a)(1). It is wholly owned by TLX Holding, also a Delaware corporation formed in connection with the tender offer. *Id.* All of the outstanding stock of TLX Holding is owned by TLX Partners, a recently-formed New York general partnership. *Id.; see also* Ex. (c)(2) to Schedule 14D–1 (General Partnership

Agreement of TLX Partners). The partners of TLX Partners are newly-organized Delaware corporations which are subsidiaries of Plaintiffs Datapoint Corporation and Intelogic Trace, Inc. *Id.* None of these entities have conducted any business other than that incident to their organization and in connection with the tender offer. *Id.* The principal executive offices of TLX Holding and TLX Partners is in New York, New York; those of the individual partners in TLX Partners are in San Antonio, Texas. *Id.* Thus, Plaintiffs necessarily and in fact employed interstate facilities to make their nationwide cash offer to purchase all of the stock in Telex. *See* Pl.Ex. 2. Purchases and sales effected pursuant to the tender offer would constitute interstate transactions. Thus, there is no question that Plaintiffs' tender offer is and results in substantial interstate commerce. *See Edgar v. Mite Corporation,* 457 U.S. at 641–42, 102 S.Ct. at 2640–41, 73 L.Ed.2d at 282–83. The Oklahoma Act indirectly regulates and affects this interstate commerce by conditioning the voting rights ordinarily incident to the shares transferred upon a resolution approved by a majority of disinterested stockholders in accordance with the procedure specified in the Act, or the inclusion of a provision in the certificate of incorporation or bylaws of the target corporation. *See* 1987 Okla.Sess.Laws ch. 146, § 19. The Oklahoma Control Shares Act on its face and as applied to a "control share acquisition" pursuant to this tender offer regulates voting rights in corporations other than those incorporated in Oklahoma, in this instance the voting rights of a Delaware corporation.

In *CTS Corporation v. Dynamics Corporation of America,* the Supreme Court stated:

So long as each State regulates voting rights only in the corporations it has created, each corporation will be subject to the law of only one State. No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of Shareholders. *See* Restatement (Second) of Conflict of Laws § 304 (1971) (concluding that the law of the incorporating State generally should "determine the right of a shareholder to participate in the administration of the affairs of the corporation"). Accordingly, we conclude that the Indiana Act does not create an impermissible risk of inconsistent regulation by different States. 481 U.S. at ——, 107 S.Ct. at 1649, 95 L.Ed.2d 85.

It follows that when a state attempts to regulate voting rights in corporations other than those it has created, such corporations will be subject to the law of more than one state, which poses an impermissible risk of inconsistent regulations by different states that may adversely affect interstate commerce. The Supreme Court's citation to section 304 of the Restatement (Second) of Conflict of Laws merely supports the Court's observation that the internal affairs doctrine is invariably applied in contexts other than Commerce Clause analysis. Were this not so, and a state other than the state of incorporation could have a greater interest in application of its local law concerning voting rights than the state which created the corporation, such that the local state law of the former could displace the *lex incorporationis,* such as Defendants suggest is the case here, the the Supreme Court in the *CTS* case would have found it necessary to determine whether some state other than Indiana, the state of incorporation of the CTS Corporation, had a greater interest in application of its law concerning voting rights following a control share acquisition. If another state had a greater interest in application of its law, then *only* that state's law, and not Indiana's law, could be constitutionally applied. If more than one state may regulate the voting rights of a corporation, the risk of inconsistent regulations remains. Numerous states might enact laws similar to Oklahoma's Control Shares Act but providing that shareholder votes on voting rights to the shares acquired or to be acquired in a control share acquisition be taken at different times. Such laws might require that a two-thirds or three-fourths majority of disinterested shareholders approve a reso-

lution granting the acquiror voting rights, or might permit shareholders who are officers and director-employees of the corporation to vote on the resolution. Such inconsistent regulations may make it impossible for a tender offeror (and the target corporation) to ever determine whether the acquiror's shares will be accorded voting rights, bringing control share acquisitions and tender offers to a sudden halt. The Commerce Clause does not countenance the *risk* of such inconsistent burdens. Because the Oklahoma Control Shares Act, both facially and as applied to the control share acquisition pursued by Plaintiffs, creates this risk of inconsistent regulation, inasmuch as it applies to corporations other than those Oklahoma has created, the statute violates the Commerce Clause.

Defendants argue that this impermissible risk does not exist because Plaintiffs have not shown that any other state has a law similar to but inconsistent with Oklahoma's. Moreover, this Court is aware that in other instances where the Supreme Court has invalidated state laws for posing an impermissible risk of inconsistent regulation, two or more inconsistent state regulations affecting interstate commerce actually existed. *See, e.g., Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). However, in this Court's view, the actual existence of inconsistent regulation is not a prerequisite to constitutional infirmity. The *"risk* of inconsistent regulation by different States" which may adversely affect interstate commerce is intolerable under the Commerce Clause. *CTS Corporation v. Dynamics Corporation of America,* 481 U.S. at ——, 107 S.Ct. at 1649, 95 L.Ed.2d at 85 (emphasis added).

The "opt-out" provision in the Oklahoma Control Shares Act, 1987 Okla.Sess.Laws ch. 146, § 19, does not rescue the Act from constitutional infirmity under this analysis. This provision requires that a corporation incorporated outside of the State of Oklahoma take affirmative action to prevent extra-territorial application of Oklahoma law and the risk of impermissible inconsist-

ent burdens attendant thereto. Thus, the opt-out provision itself represents regulation of the internal affairs of a foreign corporation. And as a practical matter, a foreign corporation may not be able to prevent the risk of inconsistent regulation. As long as states other than the state of incorporation may regulate voting rights of a corporation, there remains the possibility, present in this case, that another state will enact and make effective laws similar to but inconsistent with Oklahoma's law to which the issuing corporation may not have time to respond by opting out of it prior to the control share acquisition.

Oklahoma's Control Shares Act is also constitutionally infirm under the Commerce Clause because the burden it imposes on interstate commerce "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d at 85–88; *Edgar v. Mite Corporation,* 457 U.S. at 643–646, 102 S.Ct. at 2641–2643, 73 L.Ed.2d at 284–85. Certainly Oklahoma has an interest in protecting resident shareholders, 481 U.S. at ——, 107 S.Ct. at 1651–52, 95 L.Ed.2d at 87–8, and arguably has a legitimate interest in protecting the assets and business of corporations having all or essentially all of their assets and operations in the state or having their principal place of business in this state, at least for some purposes, but Oklahoma has "no interest in protecting nonresident shareholders of *nonresident corporations." Id.* Thus, as was the case in *Edgar v. Mite Corporation,* and unlike the case in *CTS Corporation v. Dynamics Corporation of America,* Oklahoma has no legitimate interest in the purely out-of-state sales and purchases of stock in a Delaware corporation acquired or to be acquired pursuant to a tender offer for a control share or in the voting rights attendant to the shares so transferred to weigh in its balance against the substantial burden that Oklahoma's Act places on interstate commerce. *Edgar v. Mite Corporation,* 457 U.S. at 644, 102 S.Ct. at 2641, 73 L.Ed.2d at 284. This burden includes the inhibitory effect that the law has on the making and consumma-

tion of nationwide tender offers and out-of-state transactions in the stock of foreign corporations. The inhibitory effect flows from the risk that a tender offeror will not gain voting rights in the corporation, even if the tender offer were otherwise successful; the actuality that the tender offeror's shares are not accorded voting rights which may prevent consummation of purely out-of-state transactions in stock of a foreign corporation; and the delay necessary to consummate those purely out-of-state transactions, even if the corporation's shareholders eventually approve the transfer of voting rights with the control shares. The putative local benefits of protecting resident shareholders, in this instance in excess of ten percent (10%) and less than twenty percent (20%) of the shareholders of Telex, *see* D.Ex. 2, and the absence of an interest in protecting nonresident shareholders of corporations which are not of its creation and, for that matter, "in regulating the internal affairs of foreign corporations" 457 U.S. at 646, 102 S.Ct. at 2642, 73 L.Ed.2d at 285, are outweighed by the substantial burdens the Act imposes in interstate commerce. And because the opt-out provision of the Oklahoma Act still regulates the internal affairs of a foreign corporation, which Oklahoma has no interest in regulating, *id.*, this provision does not tilt the balance of the benefits and burdens or interject the foreign corporation's interest in the equation so as to save the statute from constitutional infirmity under the Commerce Clause.

■ The Court finds that Plaintiffs have adequately established that they will sustain irreparable injury unless Defendants are restrained from invoking, applying or enforcing the Oklahoma Control Shares Act. The Court finds that Plaintiffs have demonstrated, by a preponderance of the evidence, that they are in immediate danger of sustaining an economic loss of at least one and one-half million dollars ($1,500,000) and perhaps more, which economic injury will not be compensable unless Defendants are restrained from invoking, applying or enforcing the Act. If Plaintiffs had not conditioned their purchase offer on the inapplicability of the

Oklahoma Act, Plaintiffs would stand to lose much of the real value of a multimillion dollar investment—the right to participate in the management of the corporation by the exercise of voting rights. Neither conditioning consummation of the tender offer on inapplicability of the Act, as Plaintiffs have done, nor conditioning consummation on a shareholder vote approving the conferral of voting rights pursuant to the Oklahoma Control Shares Act, as Defendants suggest Plaintiffs should have done or should do now in conjunction with extending the tender offer period, will remove the fairly immediate danger of an unfavorable vote and a substantial economic loss that is irremedial for lack of a defendant from which Plaintiffs' damages could be recovered. Moreover, under either scenario, Plaintiffs stand to lose the right to control and direct the affairs of Telex. Such loss is incapable of valuation. Moreover, the delay necessary to obtain even a favorable vote of the disinterested stockholders pursuant to the Oklahoma Act, while not *per se* unreasonable, *see CTS Corporation v. Dynamics Corporation of America*, 481 U.S. at ——, 107 S.Ct. at 1646–48, 95 L.Ed.2d at 82–3, may be fatal to a tender offer or its consummation because of the inability to obtain financing therefor, as demonstrated by Plaintiffs' evidence, specifically that Shearson Lehman will not issue its commitment letter for further funding if consummation of the tender offer must await a shareholder vote, *see* Pl.Ex. 1 (Chiappetta Affidavit) at para. 4, and Mr. Chiappetta's expert opinion that "it would be impossible to obtain financing for most tender offers unless those financing the offer were assured that the offeror would ultimately be able to vote the shares acquired pursuant to that offer." *Id.* at para. 7. Finally, it is unnecessary for Plaintiffs to comply with the Oklahoma Act and have obtained an unfavorable vote of the stockholders on their voting rights before they can claim irreparable injury; it is sufficient that such an unfavorable vote is likely, at least as likely as a favorable vote. *See City of Chanute v. Kansas Gas & Electric Co.*, 754 F.2d at 313.

It is inferable from Plaintiffs' evidence that the threatened injury to movant outweighs whatever damage the proposed injunction may cause the Defendants. Plaintiffs' evidence of the threatened irreparable harm, see above, strongly outweighs any injuries to Defendants. No evidence was offered by Defendant Telex that it has scheduled a special meeting of stockholders to determine what voting rights will be accorded any control share acquired by Plaintiffs. *See* 1987 Okla.Sess.Laws ch. 146, § 21 C. If the temporary restraining order is issued and this Court or an appellate court subsequently determines that the Control Shares Act is constitutional or that this Court abused its discretion in ordering injunctive relief, the only consequences to Defendant Telex and to the Government Defendants, representing the State's interest, is that the Telex shareholders will ultimately have to determine whether Plaintiffs' control shares will have voting rights, assuming Plaintiffs will have been successful in acquiring "control shares" as defined in the Oklahoma Act. The next annual meeting of Telex shareholders is July, 1988, *see* Tr. at 21, but a special meeting of shareholders to determine Plaintiffs' voting rights could immediately be called upon a final determination that the Oklahoma Control Shares Act is constitutional or injunctive relief was improper. Furthermore, upon such an eventuality, it is the Plaintiffs, who stand to lose voting rights in a control share, who would be significantly harmed rather than the Defendants.

The public interest would not be disserved by issuance of a restraining order, the Court concludes. Issuance of a restraining order will permit the tender offer to proceed and shareholders, including Oklahoma shareholders, an opportunity to reap the benefit of a premium for their stock.[8] Inasmuch as the State of Oklahoma can have no interest in regulating the internal affairs of Telex and no interest in application of a statute which is clearly facially unconstitutional, the public's interest cannot be said to be thwarted or harmed by issuance of a temporary restraining order.

*Conclusion*

The Court concludes that the Oklahoma Control Shares Acquisition Act, to the extent that it regulates the voting rights of "control shares" of a foreign corporation, is facially unconstitutional under the Commerce Clause, and is similarly unconstitutional as applied to Plaintiffs' tender offer to acquire "control shares" of Defendant Telex, a Delaware corporation, for two reasons: 1) It poses an impermissible risk of inconsistent state regulations of voting rights; and 2) Its burdens on interstate commerce outweigh the legitimate interests of the State of Oklahoma which it seeks to serve. The Court thus concludes that Plaintiffs have established their likelihood of success on the merits of their declaratory judgment action. The Court also finds that Plaintiffs have established the remainder of the requirements necessary for the issuance of a preliminary injunction: that Plaintiffs will suffer irreparable injury if an injunction is not issued; that the threatened injury to Plaintiffs outweighs the damage the proposed injunction will cause Defendants; and that issuance of an injunction would not be adverse to the public interest. Accordingly, but pursuant to Fed.R.Civ.P. 65(b), the Court hereby orders that Defendants Telex Corporation, Robert Henry, Attorney General of the State of Oklahoma, Jeanette B. Edmondson, Secretary of the State of the State of Oklahoma, and Susan Bryant, Administrator of the Department of Securities of the Oklahoma Securities Commission be, and Defendants therefore are restrained from attempting to invoke, apply or enforce the voting rights provisions of the Oklahoma Control Shares Acquisition Act, specifically Sections 18, 19 and 21 of chapter 146 of the 1987 Oklahoma Session Laws, for a period of ten (10) days after this order becomes effective. The effectiveness of this order is conditioned, pursuant to Fed.R.Civ.P. 65(c), upon Plaintiffs posting a $50,000 bond or equivalent security which the

---

**8.** Plaintiffs' tender offer is a cash offer to purchase all outstanding shares of common stock in Telex at sixty-five dollars net per share, *see* Pl.Ex. 2, Schedule 14D–1, Ex. (a)(1), a price substantially above the then market price at the time the offer was made. Tr. at 40.

Court determines is an adequate amount to cover such costs and damages as Defendants may sustain during the 10–day period of the restraining order if it is determined that Defendants were wrongfully restrained. Because the Court first finds that Plaintiffs have established the requisites for issuance of a preliminary injunction, the Court will enter a preliminary injunction upon expiration of the temporary restraining order unless Defendants request an opportunity to present additional evidence during the pendency of the temporary restraining order to demonstrate why a preliminary injunction should not be issued.

Plaintiffs' application for a temporary restraining order to restrain Defendants from commencing an action in any other forum to invoke, apply or enforce the Oklahoma Control Shares Act is denied. The Court is of the opinion that such an order is unnecessary and Plaintiffs made no argument or cited any authority to support such an order. Similarly, Plaintiffs' request that this Court restrain Defendants from commencing an action in any other forum to enjoin Plaintiffs' acquisition of Telex stock or a merger of Telex into Plaintiffs, or to litigate any other issues related to Plaintiffs' acquisition or merger, is denied. Plaintiffs failed to present any argument or authority for such a sweeping order and in the Court's opinion, such an order would be improper.