SALANT ACQUISITION CORP. and Salant Corporation, Plaintiffs–Counterclaim Defendants

v.

MANHATTAN INDUSTRIES, INC., Defendant–Counterclaimant,

and

Nicholas P. DiPaolo, Roy M. Goodman, Thomas Hoving, Donald H. Kallman, Harvey M. Krueger, Laurence C. Leeds, Jr., Jack Lyons, Zachary L. Solomon, Carl Spielvogel, Louis C. Stengel, Jr., and Thomas J. Tisch, Defendants,

and

State of New York, Intervenor–Defendant.

No. 88 Civ. 686 (LLS).

United States District Court, S.D. New York.

March 16, 1988.

Weil, Gotshal & Manges, New York City (Dennis J. Block, Irwin H. Warren, of counsel), for plaintiffs-counterclaim defendants.

Stroock & Stroock & Levan, New York City (Bruce Schneider, Alvin Hellerstein, Carl Kanter, of counsel), for defendant-counterclaimant.

Robert Abrams, Atty. Gen. of the State of N.Y., Dept. of Law, New York City (William H. Mohr, Asst. Atty. Gen., of counsel), for intervenor-defendant.

## OPINION AND ORDER

STANTON, District Judge.

At the oral argument on March 3, 1988, defendant's application to enjoin plaintiffs' tender offer was denied for lack of a private right of action under section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g (1982), as to plaintiffs' alleged violations of the Federal Reserve Board margin regulations, 12 C.F.R. §§ 207, 221, 224, and on the merits as to plaintiffs' allegedly inadequate disclosures in their Williams Act filings. Decision was reserved on plaintiffs' application for a preliminary injunction and declaration that (a) section 912 of the New York Business Corporation Law (McKinney's 1986) is unconstitutional, (b) plaintiffs' tender offer will not be subject to the penalty provisions of Manhattan's "Rights Plan", and (c) the recent amendment of Manhattan's by-laws is *ultra vires* and void.

For an insufficient showing of irreparable harm, a requisite for obtaining preliminary relief, plaintiffs' applications are denied.

1. Section 912 prohibits any resident domestic business corporation (such as Manhattan) from merging with an interested shareholder (i.e., one who owns 20% or more of the outstanding voting stock) for five years following the date

## FACTS

On February 2, 1988 Salant Acquisition Corporation ("SAC"), a wholly owned subsidiary of Salant Corporation ("Salant") announced a hostile, all-cash tender offer for all of Manhattan Industries' ("Manhattan") outstanding shares of common and preferred stock (the "tender offer"). The tender offer is conditioned on (1) there being validly tendered and not withdrawn at least two-thirds of Manhattan's outstanding common shares; (2) Salant being satisfied, either by action of Manhattan's Board of Directors (the "Board") or a final judicial decision, that section 912 of the New York Business Corporation Law [1] does not apply to the tender offer and the contemplated subsequent merger; (3) either Manhattan's preferred stock purchase rights having been redeemed by the Board or Salant being satisfied that the Rights are inapplicable to the tender offer and subsequent merger; and (4) SAC and Salant's obtaining sufficient financing to purchase all of Manhattan's shares and to pay the fees and expenses related to the tender offer. The Offer to Purchase also disclosed that following the tender offer, Salant would effect a "second-step merger" and would thus acquire all Manhattan's remaining shares.

The Offer to Purchase stated that, in order to finance the tender offer, plaintiffs expected to borrow up to $75 million from Continental Illinois National Bank ("the Bank") and to obtain up to $25 million from a private placement of SAC's debt securities by Drexel Burnham Lambert Incorporated ("Drexel"). Drexel, in a letter stating that it is "highly confident" that it can arrange such financing, has conditioned its obligation to place the debt securities on plaintiffs' obtaining the $75 million loan from the Bank. The Bank's loan, in turn, is conditioned on Drexel's placement of the $25 million debt. Thus, plaintiffs' ability to raise the requisite funds is contingent upon

on which the interested shareholder first acquired 20% of the stock, unless before that date the Board had approved either the merger or the interested shareholder's stock purchase.

both Drexel's and the Bank's participation, and each of the latter's prospective participation is contingent on the other's.

Plaintiffs have only a draft commitment letter from the Bank. A Bank Vice President writes that the Bank

[is] willing to have further discussions with [plaintiffs] regarding such credit arrangements and, subject to such discussions, would be willing to consider making a commitment on the terms set forth in the Draft Commitment Letter, but nothing contained in this letter or the Draft Commitment Letter constitutes a commitment or an offer by the Bank to make any loan or other financial accomodation ...

Plaintiffs must pay a non-refundable $900,000 fee before the Bank will conduct a "review, discussion, evaluation and negotiation (if any) of the credit arrangements." Apparently that payment has not yet been made.

The tender offer, as originally announced, was at $16 per share of common stock, $78.84 per share of Series A Preferred stock, and $60 per share of Series C Preferred stock, and expired at midnight on March 1, 1988. It has been extended three times and will now expire at 5 p.m. on March 18. None of the offered prices has been increased. The day before plaintiffs made the tender offer, Manhattan's common stock closed at approximately $11.50. Since the commencement of the tender offer, Manhattan's common stock has traded between $19.00 and $16.375.

As of March 14, only 169,000 shares (approximately 3%) of Manhattan common stock and 3,600 shares of Series C Preferred outstanding had been tendered and not withdrawn.[2] With those common shares and the 277,000 shares Salant owned before the tender offer, it has, at most, 446,000 or 8.3% of Manhattan's total common.

On the same day that the tender offer was announced, plaintiffs filed this suit seeking permanent and preliminary declaratory and injunctive relief establishing that (1) section 912 of the New York Business Corporation Law (the "Anti–Takeover" law) is unconstitutional on its face and as applied to the tender offer; (2) the tender offer constitutes an "All Shareholders–All Cash" tender offer which does not trigger the so-called penalty provisions of Manhattan's shareholders' Rights Plan[3]; and (3) voiding as *ultra vires* Manhattan's Board's February 9 amendment to its by-laws, which provides that if any shareholder or group of affiliated shareholders owns more than 40% of the outstanding shares entitled to vote, a majority of shares other than those held by the 40% shareholder is required to remove a director without cause.

## DISCUSSION

In this Circuit, the standard for preliminary injunctive relief requires a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for

---

**2.** As of October 31, 1987, Manhattan had outstanding 5,331,446 shares of common stock, 27,506 Series A Preferred shares, and 4,440 Series C Preferred shares.

**3.** The Rights Plan provides that if, following the completion of a tender offer, Manhattan is the surviving corporation in a merger, each Right will entitle its holder (other than a bidder who owns more than 20% of Manhattan's shares) to purchase, at the then current exercise price of the Right, that number of shares of common stock of Manhattan which at the time of such transaction would have a market value equal to two times the exercise price of the Right. In other words, all such holders of Manhattan rights will be entitled to purchase shares of Manhattan common stock at half the then current market price. If Manhattan is not the

surviving corporation in such a post-tender offer merger, then such holders of the Rights will be entitled to purchase shares of the acquiring company's common stock at half the then current market price.

The Rights, however, will not be exercisable if an acquiror obtains shares pursuant to an "All Shareholders–All Cash" tender offer (defined as a tender offer for all the outstanding common and Preferred stock for cash at a minimum price per share, pursuant to which the acquiror purchases at least two-thirds of the shares not already owned by the acquiror), the merger is consummated within six months of such a tender offer, and the offeror pays the nontendering shareholders the same amount per share as was paid the tendering shareholders.

litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). "A preliminary injunction 'is an extraordinary and drastic remedy which should not be routinely granted.' " *Sapienza v. New York News, Inc.,* 481 F.Supp. 671, 673 (S.D.N.Y.1979). Only if plaintiffs demonstrate that the alleged threat of harm is "actual and imminent," rather than merely "remote or speculative," will preliminary relief be granted. *E.I. duPont de Nemours and Co. v. Daggett,* 610 F.Supp. 260, 264 (W.D.N.Y.1985). *Accord Kaplan v. Board of Education of City School District,* 759 F.2d 256, 259 (2d Cir.1985); *Association of American Medical Colleges v. Carey,* 482 F.Supp. 1358, 1368 (W.D.N.Y.1980). Moreover, where "mandatory relief is sought, as distinguished from maintenance of the status quo, a strong showing of irreparable injury must be made...." *Doe v. New York University,* 666 F.2d 761, 773 (2d Cir.1981). *Accord Cavallaro by Cavallaro v. Ambach,* 575 F.Supp. 171, 174 (W.D.N.Y.1983).

Plaintiffs assert that absent a preliminary injunction, they will suffer extreme and irreparable injury. They contend that the provisions of New York's Anti–Takeover law constitute irreparable harm *per se,* endanger their attempt to acquire Manhattan's stock, and will cause them to incur substantial financial costs which are not recoverable. They also argue that without a determination that their tender offer does not trigger the penalty provisions of Manhattan's Rights Plan, shareholders will be deterred from tendering their shares; and plaintiffs will be deterred from accepting them, for the risk of later dilution of both voting power and market value of the Manhattan shares would make the successful completion of Salant's tender offer economically untenable. They urge that absent a determination that Manhattan's new by-law provision is *ultra vires,* all shareholders will be deterred from exercising their franchise to remove directors.

**4.** Apparently the anticipated argument is over whether the offer is so conditional that it cannot

Because the harm plaintiffs allege they will suffer differs as to each of their three applications, each application will be discussed in turn.

I. Applicability of Manhattan's Rights Plan

■ Plaintiffs assert that their tender offer was designed to fit within the exception to Manhattan's Rights Plan. Manhattan's Board, however, has stated to its shareholders that plaintiffs' offer "may not" qualify as an "All Shareholders–All Cash" tender offer. Plaintiffs urge that without a resolution, shareholders may not tender their shares because they doubt plaintiffs will risk triggering the penalty provisions and because the shareholders will hold on to their shares in order to exercise the Rights.

With only 8% of Manhattan's common stock in hand—one-eighth of the shares needed to complete the tender offer by its own terms—the application of the Rights Plan[4] to the tender offer, if it is completed, is not such a present threat of irreparable harm as to justify the extraordinary relief of a preliminary injunction.

II. Amendment to Manhattan's by-laws

■ The by-law amendment, which impedes removal of Manhattan's directors, only applies when a shareholder or group has accumulated 40% of Manhattan's outstanding shares. Plaintiffs own at most 8.3% of Manhattan's common stock, or about a fifth of the amount relevant to the amendment. For the same reasons stated above, the facts do not at this stage show such present irreparable harm as to warrant the drastic remedy of a preliminary injunction or a declaratory judgment before trial. *See FMC Corporation v. R.P. Scherer Corp.,* 545 F.Supp. 318, 322 (D.Del.1982) (no irreparable harm: if plaintiffs make proper showing at a final hearing on the merits, court can void the illegal by-law amendment).

be an "all cash" offer.

### III. Constitutionality of New York's Anti–Takeover Law

■ Plaintiffs rely upon cases concerning circumstances far different from this one. In *Kennecott Corp. v. Smith*, 637 F.2d 181 (3d Cir.1980), the state law in question prohibited the would-be offeror from commencing an offer until at least twenty days after its announcement. That directly conflicted with federal law, which requires the commencement or withdrawal of an offer within five business days of its announcement, and it delayed the offer itself. Accordingly, the Third Circuit "conclude[d] that Kennecott established that preliminary injunctive relief is necessary in this case." *Id.* at 191. *See also Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, at 847 (1st Cir.1988) (preliminary relief granted: state law, prohibiting tender offer for one year if prospective offeror fails to disclose intent to take over target company before acquiring five percent of its stock, "[r]ather than merely conditioning sales, and thus deterring them, ... prohibits certain sales outright."); *L.P. Acquisition Co. v. Tyson*, 772 F.2d 201 (6th Cir.1985) (irreparable harm: statute requires precommencement notice to the state which then may order a hearing and stay the effective date of the offer); *Cardiff Acquisitions, Inc. v. Hatch*, 597 F.Supp. 1493 (D.Minn.), *aff'd in part, rev'd in part*, 751 F.2d 906 (8th Cir.1984) (irreparable harm: plaintiff's tender offer had already been suspended by the Minnesota Commissioner). Here, none of the New York Anti–Takeover law, the by-law amendment, or the Rights Plan prevented or delayed plaintiffs from launching and maintaining their tender offer, which was announced and commenced seven weeks ago.

The New York Anti–Takeover law allows a majority of the disinterested (i.e., nontendering) shareholders to vote to exempt Manhattan from section 912, but provides that (1) the exemption is not effective until eighteen months after the vote, and (2) the exemption would not apply to a merger with SAC if it acquires 20% before or during those eighteen months.

Plaintiffs argue this inflicts irreparable injury because it necessarily imposes an 18–month waiting period before any merger can be accomplished, and—even worse—that delay inevitably excludes the possibility of the merger within six months which might allow escape from the operation of the Rights Plan. Ominous as this seems to plaintiffs, it is still the fact that they currently control only 8.3% of the stock at most. Whether they will be able—at prices now below the market—to acquire enough shares to make this risk palpable is speculative. The threatened harm may not be remote, but neither is it imminent.

Nor is the New York law the "brooding presence" felt by the plaintiff in *Icahn v. Blunt*, 612 F.Supp. 1400 (W.D.Mo.1985). That plaintiff's ownership (32.779%) was so close to the 33.33% which invoked the Missouri Control Share Acquisition Statute, that his purchase of any more shares would subject him immediately to the statute's provisions. *Id.* at 1408. No provisions apply immediately to plaintiffs. None will apply until plaintiffs acquire 20% of Manhattan's shares, a prospect for which at present they have no committed financing.

Plaintiffs assert that because the law prevents second-step mergers following a successful tender offer, it impedes would-be offerors from obtaining financing, since lenders want assurance that the assets and future earnings of the target company will be available to repay the offer debt. That may be true, particularly where the offer is highly leveraged.

But here the condition is self-imposed. Plaintiffs themselves have made the availability of a second-step merger a condition of their going forward. As far as appears, the condition was not imposed by lenders to assure security for their loans. On the contrary, it is raised by plaintiffs, so that they need not commit for financing if they do not have a clear legal path. The court in *FMC Corporation*, 545 F.Supp. at 323, in a somewhat analogous situation stated:

In short, FMC [the offeror] knowingly structured the transaction in such a way that it would be forced to "take down"

the tendered stock while the legal status of the supermajority proposal remained uncertain. It now seeks to reduce the risks inherent in the situation it created by obtaining a preliminary indication as to the legality of the supermajority proposal (and so as to the feasibility of its ultimate goal of merger) from this Court before it makes a financial commitment. In so doing, it raises difficult questions as to the appropriate role of the federal courts and grave implications for the administration of justice. Assuming, without deciding, that there are conceivable instances in which it would be appropriate for a federal court to give such an indication, the Court finds that to do so in the context of granting the extraordinary relief of a preliminary injunction would be inappropriate on the facts of this case.

Plaintiffs having declined to make binding financial commitments yet, the $75 million the Bank is willing to consider extending to plaintiffs remains but a topic for further discussion. Without the Bank's commitment, Drexel has not committed itself to the $25 million private placement.

In *TLX Acquisition Corp. v. The Telex Corp.*, 679 F.Supp. 1022 (W.D.Okla., 1987), plaintiffs, like Salant and SAC, had only conditional financing, but having paid $1.5 million toward their $6 million fee to obtain financing, they stood "in immediate danger of sustaining an economic loss of at least one and one-half million dollars and perhaps more ..." *Id.* at 1032. Salant has prudently declined to make the payment that would put it in that danger; but without the threat of harm it cannot make the showing necessary to obtain a preliminary injunction.

Plaintiffs also assert that the New York Anti–Takeover law has a chilling effect, causing shareholders to doubt whether the tender of shares would serve any purpose. The court in *Black and Decker Corp. v. American Standard Inc.*, 679 F.Supp. 1183 (D.Del.1988) found this argument speculative, in light of the other likely causes for shares not being tendered, including the fact that the market price of the target's shares was higher than the offered price, and concluded that even if a preliminary injunction were granted other factors might cause the tender offer to fail. *Id.* at 1192–93.

Here, plaintiffs' tender offer faces a variety of hazards. The offered price remains below the market price. The number of shares tendered over a seven-week period represents about 3% of the total outstanding, and the tender offer is conditioned on obtaining 66–2/3%. The proposed financing arrangements are conditioned on a number of factors, including an unpaid fee to the Bank. Some of the tender offer's conditions, such as Salant's "being satisfied" as to legal matters, are subjective.

█ A final consideration is that the court is asked, in an application for preliminary relief, to declare a state law unconstitutional. Summary disposition of significant and substantial constitutional questions is inappropriate. *UV Industries, Inc. v. Posner*, 466 F.Supp. 1251, 1258 (D.Maine 1979). *See also, Black and Decker Corp.*, at 1194 ("gratuitous discussion of the constitutionality of [the Delaware Anti–Takeover law] ... under these circumstances would amount to an advisory opinion").

## CONCLUSION

For the foregoing reasons, plaintiffs' application for a preliminary injunction is denied.

A conference will be held on March 25, 1988 at 3:40 p.m. to discuss the scheduling of necessary matters before trial.